1  DAVID B. GOLUBCHIK (State Bar No. 185520)
   dbg@lnbyb.com
2  J.P. FRITZ (State Bar No. 245240)
   jpf@lnbyb.com
3  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
4  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
5  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
6

7  Proposed Attorneys for Debtor and Debtor in Possession

8              **UNITED STATES BANKRUPTCY COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10                  **LOS ANGELES DIVISION**

11 | In re:                          | ) **Case No.: 2:10-bk-60884-VZ**
12 |                                 | )
   | **SHILO INN, DIAMOND BAR, LLC**, | ) **Chapter 11 Case**
13 |                                 | )
   |   Debtor and Debtor in Possession, | ) **DEBTOR'S EMERGENCY MOTION**
14 |                                 | ) **FOR ENTRY OF AN ORDER**
   |                                 | ) **AUTHORIZING DEBTOR TO: (A) USE**
15 |                                 | ) **CASH COLLATERAL ON AN**
   |                                 | ) **INTERIM BASIS PENDING A FINAL**
16 |                                 | ) **HEARING; AND (B) BORROW**
   |                                 | ) **MONEY ON A SECURED BASIS;**
17 |                                 | ) **MEMORANDUM OF POINTS AND**
   |                                 | ) **AUTHORITIES IN SUPPORT**
18 |                                 | ) **THEREOF**
19 |                                 | )
   |                                 | ) [Master Declarations of Mark S. Hemstreet
20 |                                 | ) and Christopher Campbell in Support
   |                                 | ) Thereof Filed Concurrently Herewith]
21 |                                 | )
   |                                 | ) Hearing:
22 |                                 | ) Date:     To Be Set
   |                                 | ) Time:
23 |                                 | ) Ctrm:     255 East Temple Street
   |                                 | )           Courtroom 1368
24 |                                 | )           Los Angeles, CA 90012
   |                                 | )
25 |                                 | )
   |                                 | )
26

27

28

1

## SUMMARY

Pursuant to Local Bankruptcy Rules 2081-1(a)(9), 4001-2 and 9075-1, 11 U.S.C. §§ 363(c), 364(b) and 503(b)(1), and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), Shilo Inn, Diamond Bar, LLC, (the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case, hereby moves, on an emergency basis (the "Motion"), for entry of an order authorizing the Debtor to (A) use cash collateral on an emergency interim basis pending a final hearing in accordance with the Debtor's operating budget (the "Budget"), a copy of which is attached as **Exhibit "4"** to the annexed Master Declaration of Christopher Campbell ("Master Declaration"), and (B) enter into a credit line agreement, in an amount not to exceed $100,000.00 from Shilo Franchise International, LLC, on a secured basis to cover possible shortfalls in operations.

The Debtor operates a 161 room full - service hotel located in Pomona, California (the "Hotel") pursuant to a franchise agreement with Shilo Franchise International, LLC.  The Hotel is a full-service hotel, which includes a business center, meeting facilities, fitness center, pool, spa, sauna, steam room, offices and restaurant.  Based on reduced occupancy, revenue and cash flow suffered, making the Debtor unable to remain current with its regular obligations to its primary secured creditor, Cathay Bank ("Cathay").  The Debtor used best efforts to negotiate a consensual forbearance agreement.  Unfortunately, Cathay decided to take an aggressive approach and commenced judicial foreclosure proceedings, including seeking the Ex parte appointment of a receiver over the Hotel.  The receiver was appointed on November 18, 2010 and took over the Hotel on November 19, 2010.

The foregoing takeover by the receiver has already caused harm to the Hotel and its operations.  Vendors are losing faith in the Debtor and Hotel employees are concerned about job security.  Guest services have also suffered, prejudicing the Hotel as well as the "Shilo Inns" good franchise brand identity and reputation.

Notwithstanding the foregoing, the Debtor continued to try to negotiate with Cathay in good faith after the appointment of a receiver.  Based on such discussions, it became evident

1  that Cathay was not interested in reaching a resolution prior to a foreclosure sale of the Hotel

2  scheduled for December 6, 2010.  In order to avoid continued harm to the Hotel, employee

3  morale and likely irreparable harm to creditors in the event of a foreclosure, the Debtor

4  determined that the commencement of this case was necessary and proper.

5         Pursuant to the Motion, the Debtor seeks Court authority to use cash collateral in order to

6  pay the expenses of maintaining and operating the Hotel, as set forth in the Budget.  The Budget

7  reflects the Debtor's ordinary and necessary operating expenses that must be paid postpetition to

8  preserve the Debtor's business.  While the Budget represents the Debtor's best estimate of such

9  expenses, the needs of the business may fluctuate.  Thus, the Debtor seeks authority to deviate

10 from the total expenses contained in the Budget by no more than 15%, on a cumulative basis, and

11 to deviate by category (provided the Debtor does not pay expenses outside any of the categories)

12 without the need for further Court order.

13        The Debtor submits that Cathay and German American Capital Corporation ("German"

14 and collectively with Cathay, the "Secured Creditors"), a junior secured creditor, are adequately

15 protected by the use of cash collateral.  Cathay and German are protected by equity cushions of

16 approximately 159.7% and 20.7%, respectively.  In addition, the Secured Creditors will be

17 further protected by the continuing management and operation of the Hotel, thereby preserving

18 the value of their collateral.

19        On the other hand, if the Debtor is not permitted to use its cash collateral to maintain and

20 operate the Hotel, it is a virtual certainty that this estate will be liquidated.  Specifically, without

21 use of cash collateral and the ability to operate, existing guests will not receive services and will

22 depart, canceling existing charges.  Moreover, without use of cash collateral, future reservations

23 will also be cancelled.    Even if the Debtor does not have use of cash collateral on a limited

24 time basis, the public perception associated with the foregoing will certainly hurt, if not

25 eviscerate, the Debtor's business, thereby reducing the value of the estate and potential recovery

26 to creditors.

27

28

**ADDITIONAL INFORMATION**

This Motion is based upon Local Bankruptcy Rules 2081-1(a)(9), 4001-2, and 9075-1, 11 U.S.C. §§ 363(c) and 364(c)(3) and Bankruptcy Rules 4001 and 9014, the supporting Memorandum of Points and Authorities and Master Declaration of Christopher Campbell and Mars K. Hemstreet filed concurrently herewith, the arguments and statements of counsel to be made at the hearing on the Motion, and other admissible evidence properly brought before the Court. The Debtor submits that the setting of the hearing on this Motion on an emergency basis is warranted given the critical need to fund operations of an active Hotel operation.

Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), while the Court cannot conduct a final hearing on this Motion earlier than 14 days after service of this Motion, the Court may conduct a preliminary hearing before such 14-day period expires to enable the Debtor to use cash collateral and obtain post-petition financing as is necessary to avoid immediate and irreparable harm to the Debtor's estate pending a final hearing. For the reasons noted herein and in the accompanying Memorandum of Points and Authorities, the Debtor must be able to pay expenses in accordance with the Budget pending a final hearing in order to avoid immediate and irreparable harm to the Debtor's business and its bankruptcy estate.

As set forth in detail in the accompanying Memorandum of Points and Authorities, the proposed use of cash collateral does not include any of the provisions set forth in Bankruptcy Rule 4001(c)(1)(B)(i) – (xi) or Local Bankruptcy Rule 4001-2(b).

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court, the Debtor served by overnight mail a copy of this Motion and all supportive papers (including notice of the hearing) upon the Office of the United States Trustee, the Secured Creditors and the Debtor's 20 largest unsecured creditors.

**WHEREFORE,** the Debtor respectfully requests that this Court enter an order:

(1)     affirming the adequacy of the Notice given herein;

(2)     granting the Motion on an interim basis pending a final hearing thereon;

1         (3)     authorizing the Debtor to use cash collateral to pay all of the expenses set forth in

2  the Budget, with authority to deviate from the line items contained in the Budget by not more

3  than 15%, on a cumulative basis;

4         (4)     authorizing the Debtor to borrow money, pursuant to a credit line agreement in

5  the amount of $100,000, on a secured basis from SFI as may be necessary to cover any operating

6  shortages set forth in the Budget;

7         (5)     setting a final hearing on the Motion; and

8         (6)     granting such other and further relief as the Court deems just and proper under the

9  circumstances.

10  Dated: November 29, 2010          SHILO INN, DIAMOND BAR, LLC

11                      By:  /s/ David B. Golubchik

12                          DAVID B. GOLUBCHIK
                        J.P. FRITZ

13                          LEVENE, NEALE, BENDER, YOO
                          & BRILL L.L.P.

14                          Proposed Attorneys for Debtor and
                        Debtor in Possession

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

1.      Shilo Inn, Diamond Bar, LLC, the debtor and debtor in possession herein ("Debtor"), commenced this case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code on November 29, 2010.   The Debtor continues to operate its business and manage its financial affairs as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

**A.      Background.**

2.      The Debtor operates a 161 room hotel located in Pomona, California (the "Hotel") pursuant to a franchise agreement with Shilo Franchise International, LLC.  The Hotel is a full-service hotel, which includes  a business center, meeting facilities, pool, spa, fitness center, steam, sauna, offices and restaurant.

3.      Mark S. Hemstreet has been the proud owner and president of the Shilo Inn Suites Hotel chain since 1974.  Today, there are 41 Shilo Inn hotels across ten western states. Mr. Hemstreet personally developed this particular Pomona, Diamond Bar 161 unit full service Hotel in 1985.

4.      The Hotel has enjoyed historical success as a stand-alone business.  While the Hotel's ideal location and facilities have made it a "go-to" location in the Pomona/Diamond Bar area, the Hotel suffered reduced occupancy as a result of the slowdown in the general economy since September 11, 2001, especially the tourist and conference industry during this long, deep historical recession.

5.      Recently, the Hotel underwent the first phase of a remodel, which cost approximately $2 million.    Additionally, recently, the Debtor obtained a new restaurant tenant to operate the onsite restaurant, which required approximately $1 Million in  improvements. This total hotel and restaurant remodel process has taken considerable time, resulting in increased expenses and reduced revenues until final completion.  It is anticipated that the

1   restaurant will open in January 2011, providing substantial additional revenue to the Debtor and

2   its estate.

3       6.    Cathay Bank[1] ("Cathay") originated the primary loan with the Debtor.  On

4   February 22, 2007, Cathay issued a replacement loan in the amount of $4,875,000.00 to the

5   Debtor.  The Debtor made timely monthly payments to Cathay until extensive remodeling and

6   renovation work began on the Hotel, at which time, pursuant to the applicable loan documents,

7   interest payments were made from an interest reserve account maintained by Cathay.  Such

8   payments from the interest reserve account continued until approximately early 2010.  Cathay,

9   for some unexplainable reason, disallowed the Debtor to use the balance of the interest reserve,

10   in the approximate amount of $143,904, that it was entitled to use, that created more

11   unnecessary financial hardship.

12       7.    Based on reduced occupancy during the extensive remodeling of the Hotel,

13   revenue and cash flow suffered, making the Debtor unable to remain current with its regular

14   obligations to Cathay.  Shortfall in operations have been paid by the Debtor's principal, Mark S.

15   Hemstreet and/or his related non-Debtor entities, and such funding continued through the date

16   of this bankruptcy filing.

17       8.    The Debtor used best efforts to negotiate a consensual forbearance agreement.

18   The Debtor provided Cathay with requested documents and addressed all concerns raised by

19   Cathay.  The Debtor was of the belief that Cathay would welcome continued operations by the

20   Debtor, especially when cash flow shortfalls were funded through assets which were not subject

21   to Cathay's security interest.  Unfortunately, Cathay decided to take an aggressive approach and

22   commenced judicial foreclosure proceedings, including seeking the appointment of an Ex parte

23   receiver over the Hotel.  The receiver was appointed on November 18, 2010 and took over the

24   Hotel on November 19, 2010.

25       9.    The foregoing takeover by the receiver has already caused harm to the Hotel and

26

27   [1] Cathay has provided financing for seven (7) other separate Shilo Inn properties.  None of the loans are cross-
28   collateralized.

1  its operations.  Vendors are losing faith in the Debtor and Hotel employees are concerned about

2  job security.  Guest services have also suffered, prejudicing the Hotel as well as the "Shilo Inns"

3  good franchise brand identity and reputation.

4        10.    Notwithstanding the foregoing, the Debtor continued to try to negotiate with

5  Cathay in good faith after the appointment of a receiver.  Based on such discussions, it became

6  evident that Cathay was not interested in reaching a resolution prior to a foreclosure sale of the

7  Hotel scheduled for December 6, 2010.  In order to avoid continued harm to the Hotel,

8  employee morale and likely irreparable harm to creditors in the event of a foreclosure, the

9  Debtor determined that the commencement of this case was necessary and proper.

10

11  **B.    Assets**

12        11.    The Debtor's primary asset is the Hotel.  Based on an industry standard valuation

13  for a hotel property similar to that of the Debtor's, market value is approximately $75,000 per

14  hotel room.  Based on the fact that the Hotel has 161 rooms, the Debtor believes that the going

15  concern value of the Hotel is at least $12,075,000.  This valuation is consistent with that of the

16  Los Angeles County Tax Collector, who has assessed the Hotel at a value of $12,111,125.  <u>See</u>

17  Annual Property Bill with assessment information, attached to the Master Declaration as

18  **Exhibit "1"**.

19        12.    In addition to the foregoing, the Debtor has other assets, which are identified in

20  Schedule B – Personal Property, a copy of which is attached to the Master Declaration as

21  **Exhibit "2"**.

22        13.    Finally, attached to the Master Declaration as **Exhibit "3"** is a copy of the

23  Debtor's latest available Balance Sheet, dated as of September 30, 2010.  The Balance Sheet

24  lists that market value of the Debtor's assets at $16,562,611.

25

26  **C.    Secured Claim**

27        14.    Cathay asserts a first priority security interest in the Debtor's assets to secure an

28

obligation in the amount of approximately $4,652,856.

15.    German American Capital Corp. ("German") asserts a second priority security interest in the Debtor's assets to secure an obligation in the amount of approximately $5,353,000.

**D.    Need For Use of Cash Collateral and Post-Petition Financing**

17.    Pursuant to the Motion, the Debtor seeks Court authority to use cash collateral in order to pay the expenses of maintaining and operating the Business, as set forth in the Budget, a copy of which is attached as **Exhibit "4"** to the Master Declaration.  The Budget reflects the Debtor's ordinary and necessary operating expenses that must be paid postpetition to preserve the Debtor's business.  While the Budget represents the Debtor's best estimate of such expenses, the needs of the business may fluctuate.  Thus, the Debtor seeks authority to deviate from the total expenses contained in the Budget by no more than 15% on a cumulative basis without the need for further Court order.

18.    As is evident in the Budget, the Debtor anticipates certain cash shortfalls from operations in the near future.  This is based on the fact that Hotel occupancy depends, in large part, on conferences and events at nearby Cal Poly and Pomona Fairgrounds, both of which scale down such conferences and events during the winter months.  Cashflow shortfalls are proposed to be covered by a Credit Line ("Credit Line") in the amount of $100,000 to be offered to the Debtor by Shilo Franchise International, LLC ("SFI") in accordance with the Term Sheet attached to the Master Declaration as **Exhibit "5"**.

19.    Notwithstanding the foregoing, the Debtor is confident that its future is bright. The Debtor has completed extensive remodeling of the Hotel and Restaurant, thereby increasing desirability and value.  The Debtor procured a new restaurant operator that is projected to commence operations, and generate additional revenue, as of January 2011.  More importantly, as evident from the Debtor's Profit & Loss Statement, a copy of which is attached to the Master Declaration as **Exhibit "6"**, the Debtor's revenues through September 30, 2010 ($913,591) are

approximately 17% higher than the same period in 2009 ($781,182).  The Debtor believes that the worst period of the recession has come to an end and its performance year-over-year supports its belief that operations should continue to improve in the future, as the attached **Exhibit "7"** recent report through November 22, 2010 indicates that the hotel's room revenue is trending up 25% year-to-date over last year for the same like period.

20.    The Debtor believes that the current valuation of the Hotel on a going concern basis, the remodeling and improvements of the Hotel and its facilities and improved performance provides adequate protection to the Secured Creditors.  The Debtor's continued operations, including the funding of any shortfalls through a junior security interest, will further protect the Secured Creditors herein.

21.    On the other hand, if the Debtor is not permitted to use its cash collateral to maintain and operate the Hotel, it is a virtual certainty that this estate will be liquidated.  Specifically, without use of cash collateral and the ability to operate, existing guests will not receive services and will depart, canceling existing charges.  Moreover, without use of cash collateral, future reservations will also be cancelled.   Even if the Debtor does not have use of cash collateral on a limited time basis, the public perception associated with the foregoing will certainly hurt, if not eviscerate, the Debtor's business, thereby reducing the value of the estate and potential recovery to creditors.

**E.    Compliance With Rule 4001(c) of the Federal Rules of Bankruptcy Procedure And Local Bankruptcy Rule 4001-2.**

Pursuant to Rule 4001(c)(1)(B) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Local Bankruptcy Rule 4001-2(b) and (d), the Debtor submits that the relief requested by the Debtor pertaining to the Debtor's use of cash collateral and borrowing of money do not contain any of the following provisions:

| **Provision** | |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |

| **Provision** | |
|---|---|
| | |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

**II.**

**DISCUSSION**

**A.    The Debtor Must Be Authorized To Use Cash Collateral To Operate, Maintain And Preserve The Hotel In Accordance With The Budget.**

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code.  Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C.§ 363(c)(l).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  See 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ."  11 U.S.C. §363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

> (A) each entity that has an interest in such cash collateral consents; or
> (B)     the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

See 11 U. S. C. §363(c)(2)(A) and (B).

1    It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the

2  purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); In re Oak Glen R-

3  Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); In re Tucson Industrial Partners, 129 B.R. 614

4  (9th Cir. BAP 1991).  In addition, where the debtor is operating a business, it is extremely

5  important that the access to cash collateral be allowed in order to facilitate the goal of

6  reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash

7  collateral is necessary to operate a business."  In re Dynaco Corporation, 162 B.R. 389 (Bankr.

8  D.N.H. 1993), quoting In re Stein, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

9    The only current source of revenue available to the Debtor to use to maintain and operate

10  the Hotel are the revenues being generated from the Hotel rooms and related amenities.  If the

11  Debtor is not permitted to use its cash collateral to maintain and operate the Hotel, it is a virtual

12  certainty that this estate will be liquidated.  Specifically, without use of cash collateral and the

13  ability to operate, existing guests will not receive services and will depart, canceling existing

14  charges.  Moreover, without use of cash collateral, future reservations will also be cancelled.

15  Even if the Debtor does not have use of cash collateral on a limited time basis, the public

16  perception associated with the foregoing will certainly hurt, if not eviscerate, the Debtor's

17  business, thereby reducing the value of the estate and potential recovery to creditors.

18    The operating expenses that the Debtor must be able to pay during the pendency of this

19  case are set forth in the Budget.  The Budget reflects the Debtor's ordinary and necessary operating

20  expenses that must be paid postpetition to preserve the Debtor's business.  While the Budget

21  represents the Debtor's best estimate of such expenses, the needs of the business may fluctuate.

22  Thus, the Debtor seeks authority to deviate from the total expenses contained in the Budget by no

23  more than 15% on a cumulative basis without the need for further Court order.

24  ///

25  ///

26  ///

27  ///

28

1   **B.      The Secured Creditors Are Adequately Protected.**

2         To the extent that an entity has a valid security interest in the revenues generated by

3   property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy

4   Code.   Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured

5   creditor's cash collateral if the secured creditor is adequately protected.  In re Mellor, 734 F.2d

6   1396, 1400 (9th Cir. 1984).  See also In re O'Connor, 808 F.2d 1393, 1398 (10th Cir. 1987); In

7   re McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("McCombs").

8         Pursuant to the Supreme Court case of United Savings Association v. Timbers of Inwood

9   Forest Associates, 108 S.Ct. 626, 629 (1988) and subsequent case law, the property interest that a

10  debtor must adequately protect pursuant to Sections 361(1) and (2) of the Bankruptcy Code is

11  only the value of the lien that secures the creditor's claim. 108 S.Ct. at 630.  See also McCombs,

12  Id., at 266.  Section 506(a) "limit[s] the secured status of a creditor (*i.e.*, the secured creditor's

13  claim) to the lesser of the [allowed amount of the] claim or the value of the collateral."

14  McCombs, Id., at 266.

15        In the case of an oversecured creditor, Section 506(a) and Timbers mandate that "there is

16  no lack of adequate protection [even where there is] a decline in collateral value" provided the

17  secured creditor remains oversecured.  McCombs, Id., at 266; In re Chauncy Street Assoc. Ltd.

18  Partnership, 107 B.R. 7, 8 (Bankr. D. Mass 1989).  In this case, the Alleged Secured Creditors

19  are adequately protected by a substantial equity cushion, replacement lien and by the continued

20  operation of the Debtor's business.

21        **1.      The Secured Creditors Will Be Adequately Protected by Substantial Equity**

22        **Cushions.**

23        As noted above, to the extent that an entity, other than the Debtor, has a valid security

24  interest in the revenues generated by the operation of the Debtor's business, those revenues

25  constitute "cash collateral" under Section 363(a) of the Bankruptcy Code.  11 U.S.C. §363(a).

26  Pursuant to Section 363(c)(2), the Court may authorize the Debtor to use a secured creditor's

27  cash collateral if the secured creditor is adequately protected.  In re Mellor at 1400.  See also In

28

re O'Connor at 1398; In re McCombs at 265.

It is well established that the existence of an equity cushion alone can constitute adequate protection to a secured creditor when a debtor seeks to use cash collateral. In re Mellor, 734 F.2d 1396 (9th Cir. 1984). In Mellor, the Ninth Circuit held that a 20% equity cushion constituted adequate protection as a matter of law. Id. at 140-01. The Ninth Circuit indicated that a cushion of less than 20% could also constitute adequate protection and cited with approval decisions holding that equity cushions of between 10% and 20% constituted adequate protection. Id., (citing In re McGowan, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding that a 10% cushion is adequate protection); In re Rogers Development Corp., 2 B.R. 679, 685 (Bankr. E. D. Va. 1980) (equity cushion of approximately 15% to 20% was adequate protection notwithstanding that the debtors had no equity in the property); see also, In re Hawaiian Pacific Industries, 17 B.R. 670, 673 (Bankr. D. Hawaii 1982) (15% cushion constituted adequate protection).

In this case, Cathay is owed approximately $4,652,856.00, while the value of the Hotel is approximately $12,075,000. This translates to an equity cushion of approximately 159.7%. Additionally, German is owed approximately $5,353,000, which translates to an equity cushion of approximately 20.7%. As a result, the Secured Creditors are adequately protected in accordance with the Mellor standard.

**2.      The Secured Creditors Will Be Further Adequately Protected By The Continued Operation Of The Debtor's Business.**

The preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. In re Triplett, 87 B.R. 25 (Bankr. W.D.Tex. 1988). See also In re Stein, 19 B.R. 458 (Bankr. E.D.Pa. 1982). The Stein Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. See also, In re McCombs, supra, where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses

1   eliminated the risk of diminution in the creditor's interest in the cash collateral and such use

2   would more likely increase cash collateral.

3       As reflected in the Budget, the Debtor's continued operation and maintenance of the

4   Hotel will adequately protect the Secured Creditors as the Debtor will continue to generate

5   revenue and preserve the value of the Hotel.  Moreover, SFI has committed to funding possible

6   shortfalls in operations on a junior secured basis, which greatly benefits the Secured Creditors by

7   ensuring continued operations without disruptions.   Other Courts have determined that the

8   Debtor's continued business operations can constitute the adequate protection of a secured

9   creditor.  See Matter of Pursuit Athletic Footwear, Inc., 193 B.R. 713 (Bankr. D. Del. 1996); In

10  re Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); In re

11  Dynaco, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); In re Immenhausen Corp., 164 B.R. 347,

12  352 (Bankr. M.D. Fla. 1994).

13      Additionally, in determining adequate protection, Courts have stressed the importance of

14  promoting a debtor's reorganization.

15      In In re O'Connor, supra, the Tenth Circuit stated:

16      "In this case, Debtors, in the midst of a Chapter ll proceeding, have proposed to

17          deal with cash collateral for the purpose of enhancing the prospects of
            reorganization.  This quest is the ultimate goal of Chapter 11.  Hence, the

18          Debtor's efforts are not only to be encouraged, but also their efforts during the
            administration of the proceeding are to be measured in light of that quest.

19          Because the ultimate benefit to be achieved by a successful reorganization
            inures to all the creditors of the estate, a fair opportunity must be given to the

20          Debtors to achieve that end.  Thus, while interests of the secured creditor whose
            property rights are of concern to the court, the interests of all other creditors

21          also have bearing upon the question of whether use of cash collateral shall be
            permitted during the early stages of administration."

22

23  808 F.2d at 1937.

24      The use of cash collateral is critical to the Debtor's ability to implement an effective

25  reorganization strategy for the benefit of all creditors.  As demonstrated herein, the use of the

26  Debtor's cash collateral, in accordance with the Budget, will preserve and maximize the Debtor's

27  assets (in particular, the Hotel) for the benefit of the estate and all creditors.  If the Debtor is not

28

1    permitted to use its cash collateral to maintain and operate the Hotel, it is a virtual certainty that

2    this estate will be liquidated.  Specifically, without use of cash collateral and the ability to

3    operate, existing guests will not receive services and will depart, canceling existing charges.

4    Moreover, without use of cash collateral, future reservations will also be cancelled.    Even if the

5    Debtor does not have use of cash collateral on a limited time basis, the public perception

6    associated with the foregoing will certainly hurt, if not eviscerate, the Debtor's business, thereby

7    reducing the value of the estate and potential recovery to creditors.

8    On the other hand, if the Debtor is authorized to use its cash collateral, the Debtor will be

9    able to continue maintaining the Hotel and generating cash flow so that the Debtor can

10    simultaneously pursue longer term strategies for the restructuring of its financial affairs.  Clearly,

11    the use of cash collateral will only enhance the prospect of the Debtor's reorganization.

12

13    **C.    The Debtor Should Be Authorized To Obtain Debtor In Possession Financing From**

14    **SFI To Cover Any Operating Shortages.**

15    Pursuant to Sections 364(c)(3) of the Bankruptcy Code, the Debtor requests authority to

16    borrow up to $100,000 on a junior basis from SFI to cover potential shortfalls in operations

17    during the bankruptcy period.  The loan will accrue interest at the rate of 5% per annum.

18    Section 364 of the Bankruptcy Code is structured with an escalating series of

19    inducements which a debtor in possession may offer to attract credit during the post-petition

20    period.  In re Photo Promotion Associates, Inc., 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), *aff'd*,

21    881 F.2d 6 (2d. Cir. 1989).  Therefore, where a trustee or debtor in possession cannot otherwise

22    obtain unsecured post-petition credit, such credit may be obtained under certain carefully

23    proscribed conditions.   In re T.M. Sweeney & Sons LTL Services, Inc., 131 B.R. 984, 989

24    (Bankr.N.D.Ill.1991).  For example, if creditors are unwilling to extend unsecured credit to a

25    debtor in possession, further inducements are offered, with court approval after notice and a

26    hearing, including, without limitation, liens equal to or senior to existing liens on encumbered

27    property in accordance with 11 U.S.C. § 364(d).  In re Photo Promotion Associates, Inc., 87 B.R.

28

at 839.

Section 364(c) of the Bankruptcy Code also enumerates certain incentives that a court may grant to post-petition lenders.  The Section 364(c) list, however, is not exhaustive.  Courts frequently have authorized the use of inducements not specified in the statute.  See, e.g., In re Ellingsen MacLean Oil Co., 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the validity of already existing liens); In re Defender Drug Stores, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to post-petition lender), aff'd 145 B.R. 312, 316 (Bankr. 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364"); In re Antico Mfg. Co., 31 B.R. 103 (Bankr. E.D.N.Y. 1983) (authorizing lien on pre-petition collateral to secure post-petition indebtedness).

Two factors courts consider in determining whether to authorize post-petition financing which contemplates the granting of a security interest in favor of the lender are (1) whether the debtor is unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e., by allowing a lender only an administrative claim per 11 U.S.C. § 364(b)(1)(A); and (2) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.  In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); see also In re Aqua Assoc., 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

1.    The Debtor Is Unable To Obtain Unsecured Credit.

Section 364(d)(1)(A) does not impose upon a debtor-in-possession the onerous duty to seek credit from every possible lender before concluding that such credit is unavailable. See In re Snowshoe Co., Inc., 789 F. 2d 1085, 1089 (4th Cir. 1986).   Instead, a good faith effort to obtain less burdensome credit is required of the debtor.

The Debtor's assets are secured by two (2) separate liens totaling approximately $10 million.  At this time, it appears that all assets of the estate are subject to a security interest. Without unencumbered assets, there can be no assurance that an unsecured debt is capable of being repaid.   While the Debtor has researched the possibility of obtaining credit on an

1    unsecured basis, none has been secured.  Moreover, based on the circumstances of this case, the

2    Debtor believes that it is unrealistic that it will be able to obtain unsecured credit.

3        Not only is the Debtor unable to obtain unsecured credit, the Debtor is unable to obtain

4    secured credit without taking out the existing secured creditors.  SFI, on the other hand, has

5    agreed to provide financing on a junior secured basis, which does not impair the Secured

6    Creditors' interests herein.  Under these circumstances, the Debtor believes that the terms of the

7    proposed Line of Credit are very favorable to the Debtor and the estate, and essential to the

8    Debtor's business operations and reorganization efforts.

9        2.    The Terms Of The Proposed Post-Petition Financing Are Fair, Reasonable and

10            Adequate.

11        The Debtor submits that the terms of the Line of Credit from SFI are fair, reasonable and

12    adequate.  While in determining whether to approve such a transaction, a Court is authorized to

13    act in its informed discretion, In re Ames Department Stores, Inc., 115 B.R. 34, 37 (Bankr.

14    S.D.N.Y. 1990), the Court should give broad deference to the business decision of a chapter 11

15    debtor, particularly with respect to a debtor's business judgment regarding the need for and

16    proposed use of funds. Richmond Leasing Co. v. Capital Bank N.A., 762 F.2d 1303, 1311 (5th

17    Cir. 1985).  As the court noted in Ames Dept. Stores, "the court's discretion under section 364 is

18    to be utilized on the grounds that permit the reasonable business judgment [of the Debtor] to be

19    exercised . . . ." In re Ames Dept. Stores, Inc., 115 B.R. at 40.

20        The Debtor, in the exercise of its business judgment, has concluded that borrowing this

21    money from SFI is in the clear best interests of the Debtor's estate because without such funds,

22    the Debtor may have difficulty funding possible shortfalls in operations, especially during the

23    holiday period when business and conference travel is reduced.

24        Specifically, with the Line of Credit, the Debtor would be able to cover any shortfalls in

25    operations, possess cash that could be utilized for ordinary, day to day business expenses, and

26    marketing.  The infusion of cash will permit the Debtor to operate more efficiently and generate

27    revenue for the benefit of the estate and all creditors, and be able to meet the demands of guests

28

1    while attracting new ones, for the benefit of the Debtor's estate.

2        The Line of Credit will allow the Debtor to sustain operations at capacity while providing

3    an appropriate cushion in a situation where the Debtor is in need of additional operating capital

4    to generate more revenues.  The terms of the Line of Credit are simple, fair and reasonable, and

5    are crafted for the narrow purpose for which the Line of Credit is being requested.  The Line of

6    Credit is thus a favorable financing arrangement to the Debtor which has been proposed for the

7    benefit of the Debtor's estate.  For these reasons, the Court should approve the Line of Credit for

8    the Debtor.

9                                **III.**

10                            **<u>CONCLUSION</u>**

11        Based on the foregoing, the Debtor submits that approval by this Court of the Motion is

12    in the best interests of the Debtor's estate and respectfully requests that the Court enter an order:

13        (1)    affirming the adequacy of the Notice given herein;

14        (2)    granting the Motion on an interim basis pending a final hearing thereon;

15        (3)    authorizing the Debtor to use cash collateral to pay all of the expenses set forth in

16    the Budget, with authority to deviate from the line items contained in the Budget by not more

17    than 15%, on a cumulative basis;

18        (4)    authorizing the Debtor to borrow money, pursuant to a credit line agreement in

19    the amount of $100,000, on a secured basis from SFI as may be necessary to cover any operating

20    shortages set forth in the Budget;

21        (5)    setting a final hearing on the Motion; and

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28

1          (6)      granting such other and further relief as the Court deems just and proper under the

2    circumstances.

3    Dated: November 29, 2010                    SHILO INN, DIAMOND BAR, LLC

4                                                By:    /s/ David B. Golubchik
5                                                       DAVID B. GOLUBCHIK
                                                        J.P. FRITZ
6                                                       LEVENE, NEALE, BENDER, YOO
                                                         & BRILL L.L.P.
7                                                       Proposed Attorneys for Debtor and
                                                        Debtor in Possession
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28