DAVID B. GOLUBCHIK (State Bar No. 185520)
dbg@lnbyb.com
J.P. FRITZ (State Bar No. 245240)
jpf@lnbyb.com
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244

Attorneys for Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>SHILO INN, DIAMOND BAR, LLC,<br><br>    Debtor and Debtor in Possession. | ) Lead Case No.: 2:10-bk-60884-VZ<br>)<br>)<br>) Jointly administered with:<br>) 2:10-bk-62057-VZ (Shilo Inn, Killeen, LLC)<br>) |
| In re:<br><br>SHILO INN, KILLEEN, LLC,<br><br>    Debtor and Debtor in Possession. | ) Chapter 11 Cases<br>)<br>)<br>) **NOTICE OF MOTION AND MOTION<br>) (1) PURSUANT TO BANKRUPTCY<br>) RULE 9019 TO APPROVE<br>) COMPROMISE OF CONTROVERY;<br>) AND (2) TO DISMISS BANKRUPTCY** |
| ☐ Affects All Debtors<br><br>☐ Affects Shilo Inn, Diamond Bar, LLC only<br><br>☒ Affects Shilo Inn, Killeen, LLC only | ) **CASE; MEMORANDUM OF POINTS<br>) AND AUTHORITIES AND<br>) DECLARATION OF CHRISTOPHER<br>) CAMPBELL IN SUPPORT THEREOF**<br>)<br>) <u>Hearing:</u><br>) Date:    August 23, 2011<br>) Time:    11:00 a.m.<br>) Ctrm:    255 East Temple Street<br>)        Courtroom 1368<br>)        Los Angeles, CA 90012<br>) |

1       **PLEASE TAKE NOTICE** that, on August 23, 2011, at 11:00 a.m. in Courtroom 1368

2 of the United States Bankruptcy Court for the Central District of California, Los Angeles

3 Division, before the Honorable Vincent P. Zurzolo, United States Bankruptcy Judge, a hearing

4 will be held to consider the motion ("Motion"), filed by Shilo Inn, Killeen, LLC, the Chapter 11

5 debtor and debtor in possession herein (the "Debtor"): (1) for approval of compromise, pursuant

6 to Federal Rule of Bankruptcy Procedure 9019, with Cathay Bank; and (2) to dismiss this

7 bankruptcy case after the Agreement (defined below) with Cathay Bank is closed; provided that

8 the Agreement, and the transactions, releases, payments and agreements consummated pursuant

9 to the Agreement, shall pursuant to the approval order survive dismissal of this case and remain

10 in full force and effect thereafter.

11       **PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice of the

12 Motion, the following memorandum of points and authorities, Rule 9019 of the Federal Rules of

13 Bankruptcy Procedure, 11 U.S.C. § 1112(b), the attached declaration of Christopher Campbell,

14 all pleadings and papers filed in this action, those matters as to which the Court can take judicial

15 notice and such other argument and evidence as the Court may entertain.

16       **PLEASE TAKE FURTHER NOTICE** that, in the event you have any questions with

17 respect to the Motion or the underlying settlement, please contact counsel for the Debtor, whose

18 name and contact information are set forth on the first page of this notice.

19       **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-

20 1(c)(2), any oppositions to the Motion must be in writing and shall be filed with the Court and

21 served upon counsel for Debtor not later than fourteen (14) days before the date designated for

22 the hearing on the Motion.

23 ///

24 ///

1

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(h), any opposition not timely filed and served may be deemed by the Court to be consent to the granting of the Motion.

Dated: August 1, 2011

SHILO INN, KILLEEN, LLC

By:

DAVID B. GOLUBCHIK
JOHN-PATRICK M. FRITZ
LEVENE, NEALE, BENDER, YOO
   & BRILL L.L.P.
Attorneys for Debtor and
Debtor in Possession

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF FACTS

**A.    Background**

Shilo Inn, Killeen, LLC, the debtor and debtor in possession herein ("Debtor") commenced this case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code on December 6, 2010.  The Debtor is operating its business and managing its financial affairs as a debtor in possession pursuant to 11 U.S.C. Sections 1107 and 1108.

The Debtor is a limited liability company formed under the laws of the state of Oregon. The Debtor operates a 160 all-suite full-service hotel located in Killeen, Texas (the "Hotel") pursuant to a franchise agreement with Shilo Franchise International, LLC ("SFI").  The Hotel is a full-service all-suites hotel with half the suites being full kitchen suite units. The Shilo hotel amenities includes a guest hospitality lounge, business center, large meeting and banquet facilities, indoor pool and spa, fitness center, steam room, sauna, as well as an outdoor spa, offices, restaurant, lounge and one of the only deluxe cigar bars in the Killeen area.

Mark S. Hemstreet has been the proud owner and president of the Shilo Inn Suites Hotel chain since 1974.  Today, there are 41 Shilo Inn hotels across ten western states.   Mr. Hemstreet personally developed this particular Killeen 160 all-suite, full service Hotel in 2007.

Cathay Bank ("Cathay") is the Debtor's primary secured creditor.  Cathay asserts a claim that arises out of a loan made by Cathay to the Debtor (the "Cathay Loan") evidenced by the Note (defined below) and secured, in part, by the Hotel and the revenue from the Hotel. Specifically, Cathay owns a Term Note dated as of December 11, 2007, in the original principal amount of $15,500,000.00 (the "Note") payable to Cathay's order and executed by the Debtor. The Debtor executed, in part, the following agreements to govern, evidence, or secure the Note and the Cathay Loan evidenced by the Note: (i) a Letter Loan Agreement ("Letter Loan Agreement") executed by the Debtor and Cathay, (ii) a Deed of Trust, Absolute Assignment of Rents, Security Agreement and Financing Statement, dated as of December 11, 2007 ("Deed of Trust") executed by the Debtor, and (iii) an Absolute Assignment of Rents, dated as of

1    December 11, 2007 ("Rental Assignment")(collectively, the Note, the Deed of Trust, the Letter

2    Loan Agreement, and the Rent Assignment, together with all other documents that evidence,

3    secure or govern the Cathay Loan or the Note, are referred to herein as the Cathay Loan

4    Documents"). Hemstreet executed a guaranty agreement with respect to the Note, the Cathay

5    Loan Documents and the Cathay Loan, subject to the terms thereof.

6          In 2009 the Hotel suffered reduced occupancy and revenues as a result of the slowdown

7    in the general economy, especially the tourist and conference industry, during this long, deep

8    historical recession. Although the Hotel has begun to recover in 2010 with revenues up year-to-

9    date through the end of November 2010, room revenues are still down approximately 3% from

10   their 2008 levels for the first 11 months of 2010 compared to the same 11-month period in 2008.

11         For various reasons, including without limitation, the general downturn in the economy,

12   commencing in December 2009, the Debtor was unable to timely make the required payments of

13   principal and interest due and owing to Cathay and defaulted. The Debtor and Cathay discussed

14   various alternatives but were unable to reach an agreement regarding a long- term restructuring

15   of the loan. Cathay posted the Hotel for a foreclosure sale to occur in December 2010. The

16   Debtor commenced this case to stay the foreclosure sale. Other than the foreclosure effort by

17   Cathay, the Debtor had no reason to commence this bankruptcy case.

18         Cathay also owns a separate note secured by the hotel project owned by the Debtor's

19   affiliate (and related Chapter 11 debtor), Shilo Inn, Diamond Bar, LLC ("Diamond Bar") a

20   debtor in Case No. 2:10-bk-60884-VZ ("Diamond Bar Case"). This settlement does not affect

21   the rights and remedies of the parties related to Diamond Bar and the Diamond Bar case and the

22   rights of Cathay, Diamond Bar and Mr. Hemstreet with respect to the Diamond Bar Case are

23   expressly reserved and unaffected by this Motion.

24

25   **B.    Events During Bankruptcy**

26         As of the commencement of the Debtor's bankruptcy case and thereafter, the parties were

27   adversarial, including in connection with the Debtor's initial request for use of cash collateral,

28

4

1  Cathay's request to transfer venue of the case to Texas, and the Debtor's proposed plan of

2  reorganization.  Other than Cathay, no other creditors have taken an active role in this case or

3  appear at any hearings related thereto.

4      Notwithstanding the foregoing, the Debtor and Cathay engaged in settlement discussions.

5  Initially, the parties agreed to the terms of use of cash collateral, which was approved by the

6  Court.

7  

8      Cathay then objected to the Debtor's proposed disclosure statement.  Cathay made clear

9  that it intended to vote against and object to the Debtor's proposed plan of reorganization.  Over

10 the course of the last two months,  Cathay and the Debtor discussed a global resolution of this

11 case and the terms of payment of Cathay's claim.  After extensive arms- length negotiations, the

12 parties have reached the terms of a settlement which resolves the necessity for this case and

13 allows the Debtor to seek dismissal of this case.

14 

15 

16 **C.**    **Settlement Agreement**

17     Attached to the accompanying Declaration of Christopher Campbell as Exhibit "1" is a

18 true and correct copy of a fully-executed Term Sheet describing the settlement terms, along with

19 the approved forms of Modification Agreement and Reinstatement Agreement attached thereto

20 (the "Agreement").  In the event of any conflict between the Agreement and the summary and

21 description of the Agreement in this Motion, the terms in the Agreement govern.  Subject to the

22 actual terms of the Agreement, following is a summary of certain provisions of the Agreement:

23 

24     1.    The Killeen Loan and the Killeen Loan Documents are reinstated, subject only to

25 the modifications outlined in the Agreement.  The liens securing the Killeen Loan and the Note

26 are ratified and affirmed   Cathay shall be deemed to have an allowed secured claim as follows:

27 

28

(a)    $14,902,868.33 representing unpaid principal balance under the Killeen Note as of August 1, 2011;

(b)    $652,599.16 representing accrued, unpaid pre-petition interest (accrued prior to the Petition Date) under the Killeen Note;

(c)    $101,840.94 representing Cathay's pre-petition (accrued prior to the Petition Date) costs, expenses and legal expense;

(d)    $94,667.50 representing pre-petition late charges (accrued prior to the Petition Date);

(e)    $580,309.42 representing post-petition interest (accrued after the Petition Date) through July 31, 2011 on the unpaid principal balance of the Note at the non-default contract rate;

(f)    $233,159.06 representing Cathay's post-petition legal expenses and costs, including costs of consultants, as of May 31, 2011;

(g)    $20,000.00 representing fees and costs incurred by Cathay after May 31, 2011 and through the date of the Agreement in connection with negotiating this Agreement and the Modification Agreement and obtaining approval of the Agreement in this case, as well as the fees and costs incurred by Cathay solely in connection with the existing guaranty lawsuit filed by Cathay in Texas against Mr. Hemstreet based upon his guaranty of the Killeen Loan (such Texas lawsuit, the "Guarantor Lawsuit").

2.    Cathay's allowed secured claim shall be paid by the Debtor as follows:

(a)    The unpaid principal balance of $14,902,868.33 shall be allocated into the following two components for purposes of the applicable interest rate and the terms of repayment: (i) the first component is referred to as "Portion A" and shall be comprised of the outstanding principal balance of $8,125,000.00 and (ii) the second component is referred to as

1  "Portion B" and shall be comprised of the outstanding principal balance of $6,777,868.33.

2      (b)  **Component A**

3          (i)  Component A shall bear interest at the rate of 5.5% per annum

4  after August 1, 2011.  Monthly payments of accrued interest start September 1,

5  2011.

6

7          (ii)  in addition to interest, as set forth above, Debtor shall make

8  principal payments of: (i) $3,957.50 per month commencing with a payment due

9  and owing on September 1, 2011, through August 1, 2012, (ii) $23,957.50 per

10  month commencing with a payment due and owing on September 1, 2012, and

11  each month through the maturity date; and (iii) all unpaid principal payable on

12  maturity date or upon acceleration.

13

14          (iii)  the unpaid balance shall be due and payable in full on August 1,

15  2016 or upon acceleration of the maturity date after default

16          (iv)  Maturity date:  Non-default maturity date of August 1, 2016.

17      (c)  **Component A**

18          (i)  Component A shall bear interest at the rate of 3.5% per annum.

19          (ii)  Interest payments only until maturity.  Monthly payments of

20  accrued interest start September 1, 2011.

21          (iii)  the unpaid balance shall be due and payable in full on August 1,

22  2016, or upon acceleration of the Maturity Date after default.

23

24          (iv)  Maturity date:  Non-default maturity date of August 1, 2016

25      (d)  In addition to Component A and Component B, the remaining balance of

26          the allowed claim (which includes the allowed accrued interest, late

27

28

charges, attorneys' fees and costs through August 1, 2011) shall be paid as follows:

a.  At Closing, the Debtor shall pay to Cathay $100,000 (the "$100,000 Closing Payment") to be applied towards accrued unpaid interest (pre- or post-petition interest) due and owing under the Note through August 1, 2011.

b.  At Closing, the Debtor shall pay to Cathay the $20,000 Closing Fee Payment.

c.  The Debtor will continue to make monthly adequate protection payments to Cathay pursuant to the cash collateral stipulation which, through the end of August 2011, should total five payments in the aggregate amount of $232,500, to be applied towards accrued unpaid post-petition interest due and owing under Cathay's note through August 1, 2011.

d.  The balance of the accrued interest, late charges, attorneys' fees and costs through August 1, 2011, which is estimated to be $1,330,076.08, shall be paid as follows:

   i.  Starting on September 1, 2011, monthly payments by Debtor to Cathay of $7,000 per month.

   ii.  A payment by Debtor to Cathay of an additional $50,000 not later than August 1, 2012.

   iii.  Unpaid balance to be paid in full on August 1, 2016.

(e)  A loan modification fee in the amount of $100,000 shall accrue and be payable at maturity unless the Cathay Loan is repaid by August 1, 2014.

8

(f)    In the event that the loan is repaid after August 1, 2014 but before the maturity date of August 1, 2016, a 1% prepayment penalty will be due and payable.

(g)    Outstanding secured property taxes shall be repaid within four (4) months (September, October, November and December 2011).

(h)    Equity distributions by the Debtor are prohibited, other than out of excess cash flow and only upon certain terms and conditions (i.e. no defaults). In the event that the Debtor is permitted to make distributions of excess cash flow to equity, subject to notice provisions, such distributions shall be allocated 60% to equity and 40% to Cathay as payments on the obligations as provided for in the Agreement;.

(i)    Certain insiders execute subordination agreements in favor of Cathay, as set forth in the Agreement and agree to cap management fees and franchise fees;

(j)    To the extent that the Debtor has a cash flow shortfall, Mr. Hemstreet may provide an unsecured, subordinated, interest-free unsecured loan to the Debtor subject to the terms in the Agreement which may be repaid so long as the conditions set forth in the Agreement are satisfied;

(k)    Mr. Hemstreet ratifies his limited guaranty of the Killeen loan and Killen Loan Documents. The Guaranty Lawsuit filed by Cathay against Mr. Hemstreet in Texas related to Mr. Hemstreet's guaranty of the Killeen Loan (and only that lawsuit) shall be dismissed without prejudice.

(l)    Additional reporting and compliance requirements as provided in the Agreement.

9

(m)    The Debtor and Mr. Hemstreet release Cathay and others from, among
other things, claims related to the Debtor and the Killeen Loan and Killeen
Loan Documents, including any avoidance rights of the Debtor.

(n)    The settlement is subject to obtaining a title company endorsement.

(o)    Upon approval of the Agreement by this Court and a closing of the
Agreement, this case is dismissed; provided that the Agreement, and the
transactions, releases, payments and agreements consummated pursuant to
the Agreement, shall pursuant to the approval order survive dismissal of
this case and remain in full force and effect thereafter.

The Debtor believes that the terms of the settlement, as incorporated into the Agreement,
are fair, reasonable and will allow the Debtor to operate outside of bankruptcy. Specifically, the
Debtor's valuation shows that Cathay is oversecured. Although Cathay may, arguably, assert
default interest (at least for the pre-petition period), under the Agreement, no default interest is
asserted. The Agreement establishes the terms of payment of Cathay's claim. Moreover, the
Debtor believes the Agreement allows the Debtor to make payments to Cathay within the
parameters and restrictions of the Debtor's existing cashflow. Finally, reaching a settlement, as
opposed to continuing litigation, results in a definite resolution to a dispute, as opposed to
uncertainties in litigation, without expenditure of hundreds of thousands of dollars on
professionals and experts, which would constitute administrative expense claims of the estate.

**D.    Dismissal of Case**

Based on the fact that the dismissal of this case is incorporated into the Agreement, upon
approval of the Agreement and subject to and upon the closing of the Agreement, the Debtor
seeks to dismiss this case forthwith, provided that the Agreement, and the transactions, releases,

payments and agreements consummated pursuant to the Agreement, shall pursuant to the approval order survive dismissal of this case and remain in full force and effect thereafter. As discussed above, the only reason for this filing was the Debtor's dispute with Cathay. Approximately 90% of unsecured debt is that of the Debtor's insiders and affiliates. The Debtor has remained relatively current with all other vendors and will continue to make payments to its vendors, including those holding pre-petition claims.

The only other debt which is in substantial arrears is secured property tax liability, which is senior in priority to the position of Cathay and, therefore, adequately protected. Moreover, pursuant to the Agreement, the Debtor is required to repay outstanding secured property taxes over a period of four (4) months, which will bring the Debtor current with its property tax obligations.

Other than Cathay, no one else has taken an active role in this case. The Debtor, therefore, believes that no creditor will be impaired by the dismissal of this case since the Debtor will continue to honor all obligations of its vendors. More importantly, without the additional administrative costs associated with a bankruptcy proceeding, the Debtor will be in a stronger cash flow position to satisfy the obligations of its creditors. Based on the foregoing, the Debtor believes dismissal of the case is a much better alternative for all creditors in light of the settlement with Cathay.

The Debtor, exercising its business judgment, believes that the approval of the Agreement, including the dismissal of this case, is in the best interest of the estate and all creditors.

///

///

///

## II.    **DISCUSSION**

A.    The Court Should Approve the Settlement Agreement with Cathay Pursuant to Bankruptcy Rule 9019(a).

Bankruptcy Rule 9019(a) provides that:

> On motion by the [debtor in possession] and after notice and hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor and indenture trustees as provided in [Bankruptcy Rule] 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

The Court of Appeals for the Ninth Circuit has long recognized that "[t]he bankruptcy court has great latitude in approving compromise agreements." Woodson v. Fireman's Fund Ins. Co. (*In re* Woodson), 839 F.2d 610, 620 (9th Cir. 1988). "The purpose of a compromise agreement is to allow the [debtor in possession] and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." Martin v. Kane (*In re* A & C Properties), 784 F.2d 1377, 1380-81 (9th Cir. 1986), cert. denied 479 U.S. 854 (1986). Accordingly, in approving a settlement agreement, the Bankruptcy Court need not conduct an exhaustive investigation of the claims sought to be compromised. See United States v. Alaska National Bank (In re Walsh Constr., Inc.), 669 F.2d 1325, 1328 (9th Cir. 1982). Rather, it is sufficient that the Bankruptcy Court find that the settlement was negotiated in good faith and is reasonable, fair, and equitable. See In re A & C Properties, supra, 784 F.2d at 1381.

The Court of Appeals for the Ninth Circuit has identified the following factors for consideration in determining whether a proposed settlement agreement is reasonable, fair, and equitable:

> (a)    the probability of success in the litigation;
>
> (b)    the difficulties, if any, to be encountered in the matter of collection;

   (c)  the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and

   (d)  the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

In re A & C Properties, supra, 784 F.2d at 1381 (the "A & C Factors").

  Consideration of these factors does not require the Bankruptcy Court to determine whether a settlement presented is the best one that could possibly have been achieved. Rather, the Bankruptcy Court need only canvass the issues to determine whether the settlement falls "below the lowest point in the zone of reasonableness." Newman v. Stein, 464 F.2d 689, 698 (2d Cir. 1972) (emphasis added), cert. denied sub nom. Benson v. Newman, 409 U.S. 1039 (1972); see also Anaconda-Ericsson Inc. v. Hessen (In re Teltronics Services, Inc.), 762 F.2d 185, 189 (2d Cir. 1985); Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983), cert. denied 464 U.S. 822 (1983). Finally, although the Bankruptcy Court should give deference to the reasonable views of creditors, "objections do not rule. It is well established that compromises are favored in bankruptcy." In re Lee Way Holding Co., 120 B.R. 881, 891 (Bankr. S.D. Ohio 1990).

  Based on an analysis of the Settlement Agreement in light of the A & C factors, the Debtor believes that the terms of the settlement are fair, reasonable, and in the best interests of its creditors and the estate.

  1.  The probability of success in the litigation.

  The litigation between the parties is complex based on the valuation, appropriate interest rate, appropriate loan term, and related plan confirmation issues to be presented and adjudicated by the Court. In addition to the parties' respective professionals, it is likely that a neutral appraiser will also be appointed by the Court, thereby requiring additional expenditures by all

parties. While the Debtor is confident that the value of the Hotel is substantially greater than the debt owing to Cathay, the actual outcome is uncertain. If Cathay is deemed to be undersecured, it will likely control all classes of claims and, as a result, confirmation would be virtually impossible over Cathay's objection. The parties also dispute the terms of treatment of Cathay's claim in the Debtor's proposed plan and whether the plan is fair and equitable, requiring further evidence and expert testimony. The costs of reaching plan confirmation will be very expensive and time consuming, which the Debtor cannot afford at this time. The Agreement resolves the uncertain associated with the litigation and, more importantly, without incurring hundreds of thousands of dollars in administrative expenses litigating the dispute.

2. <u>The difficulties, if any, to be encountered in the matter of collection.</u>

The Debtor believes this is not a material issue in this case. The litigation would focus on Cathay's claim and repayment of such claim in connection with plan confirmation. It is unlikely that the Debtor would pursue collection claims against Cathay other than reducing the obligation owed.

3. <u>The complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it.</u>

The Debtor submits that this factor overlaps factor No. 1 above and the Debtor incorporates the forgoing discussion herein.

4. <u>The paramount interest of the creditors and a proper deference to their reasonable views in the premises.</u>

The interests of creditors primarily include the completion of administration of the Debtor's estate. The Debtor is unable to complete such administration until its litigation with Cathay is finally adjudicated which, without settlement, would likely not be many months and at a cost of hundreds of thousands of dollars. The settlement provides for a resolution of the

1    disputes between the Debtor and Cathay, and will allow the Debtor to complete the

2    administration of its estate through dismissal of the case.  More importantly, the settlement and

3    dismissal will allow the Debtor to focus on its operations for the benefit of all creditors as

4    opposed to continuing to incur administrative expenses, which are senior to unsecured creditor

5    claims.  As a result, Debtor submits that approval of the Agreement is in the overwhelming best

6

7    interest of all creditors of the Debtor's estate.

8

9    B.        Upon Approval and Closing of the Agreement, the Court Should Dismiss This

10             Case.

11             Section 1112(b(1)) of the Bankruptcy Code provides in relevant part as follows:

12             [O]n request of a party in interest, and after notice and a hearing, . .

13             . the court shall convert a case under this chapter to a case under
               chapter 7 or dismiss a case under this chapter, whichever is in the

14             best interests of creditors and the estate, if the movant establishes
               cause.

15    11 U.S.C. § 1112(b).

16

17             Section 1112(b)(4) of the Bankruptcy Code contains 16 examples of what constitutes

18    "cause."  Notably, the 16 examples of "cause" for dismissal set forth in the Bankruptcy Code

19    generally relate to bad acts by a debtor.  This is not surprising because dismissal is usually seen

20    as the ultimate penalty when a debtor fails to proceed as required by the Bankruptcy Code and

21    Bankruptcy Rules.  See In re Kimble, 96 B.R. 305, 307 (Bankr. D. Mont. 1988).  The foregoing

22    examples of cause for dismissal are not exclusive and "'[a] court may consider other factors as

23    they arise and may 'use its equitable powers to reach an appropriate result in individual cases.'"

24    In re Mechanical Maintenance, Inc., 128 B.R. 382, 386 (E.D. Pa. 1991) (quoting S. Rep No. 989,

25    95th Cong., 2d Sess. 117, reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5903); see

26    also 11 U.S.C. § 102(3); H. Rep. 595, 95th Cong., 1st Sess. 406 (1977) (the legislative history

27

28

1   explains that the Section 1112(b)(4) list is not exhaustive and that courts "will be able to consider

2   other factors as they arise, and to use their equitable powers to reach an appropriate result in

3   individual cases.").

4       Once it is determined that "cause" exists, the Court must determine whether to convert or

5
6   dismiss the case based on what is in the best interests of creditors and the estate.  In re Staff

7   Investment Co., 146 B.R. 256, 260 (Bankr. E.D. Cal. 1993); In re Evans, 2002 WL 33939733, 1

8   (Bankr. D. Idaho 2002).  This determination is committed to the Court's wide discretion. Pioneer

9   Liquidating Corp. v. United States Trustee (In re Consolidated Pioneer Mortgage Entities), 248

10  B.R. 368, 375 (9th Cir. BAP 2000); Kimble, 96 B.R. at 307.  A "[d]ebtor's request [to dismiss its

11  Chapter 11 bankruptcy case] should ordinarily be granted unless some 'plain legal prejudice'

12
13  will result to the creditors.'"  Kimble, 96 B.R. at 907 (quoting In re Geller, 74 B.R. 685, 688-89

14  (Bankr. E.D. Pa. 1987, citing In re Hall, 15 B.R. 913, 915-16 (9th Cir. BAP 1981; In re

15  International Airport Inn Partnership, 517 F.2d 510, 512 (9th Cir. 1975)).

16      In this case, as discussed above, the only reason for this filing was the Debtor's dispute

17  with Cathay.   Approximately 90% of unsecured debt is that of the Debtor's insiders and

18  affiliates.  The Debtor has remained relatively current with all other vendors.  Upon dismissal of

19  this case, the Debtor intends to continue to pay its vendors.

20
21      The only other debt which is in substantial arrears is secured property tax liability, which

22  is senior in priority to the position of Cathay and, therefore, adequately protected.  Moreover,

23  pursuant to the Agreement, the Debtor is required to repay outstanding secured property taxes

24  over a period of four (4) months, which will bring the Debtor current with its property tax

25  obligations.

26      Other than Cathay, no one else has taken an active role in this case.  The Debtor,

27  therefore, believes that no creditor will be impaired by the dismissal of this case since the Debtor

28

will continue to honor all obligations of its vendors. More importantly, without the additional administrative costs associated with a bankruptcy proceeding, the Debtor will be in a stronger cash flow position to satisfy the obligations of its creditors.

Based on the foregoing, the Debtor respectfully submits that "cause" exists under 11 U.S.C. § 1112(b) for the dismissal of the Debtor's chapter 11 bankruptcy case.

C.    Dismissal Of The Debtor's Case Is In The Best Interest Of Creditors And The Estate.

Once cause for relief under Section 1112(b) has been established, that section offers a choice between converting the chapter 11 case to a case under chapter 7, or outright dismissal, "whichever is in the best interest of creditors and the estate."   11 U.S.C. § 1112(b).   The Bankruptcy Code does not define the phrase "best interest of creditors and the estate."   Under the circumstances, and the fact that, upon dismissal, the Debtor will be able to operate and pay its vendors, including those holding pre-petition claims, the Debtor respectfully submits that dismissal of the Debtor's case is in the best interest of creditors and its estate.

D.    Payment Of U.S. Trustee Quarterly Fees.

To the extent that any quarterly fees are due and owing to the Office of the United States Trustee, the Debtor agrees to make such payments as a condition to the dismissal of this case.

### III.    CONCLUSION

For the reasons set forth above, the Debtor respectfully requests that the Bankruptcy Court enter an Order:

(i)    granting the Motion in its entirety;

(ii)    approving the Agreement in its entirety;

(iii)    authorizing the Debtor to take any and all steps necessary to comply with and consummate the terms of the Agreement;

1   (iv)  dismissing this case after the Closing of the Agreement; and

2   (v)  granting such other and further relief as the Court deems just and proper.

3  Dated: August 1, 2011      SHILO INN, KILLEEN, LLC

4

5            By:

6              DAVID B. GOLUBCHIK
               JOHN-PATRICK M. FRITZ

7              LEVENE, NEALE, BENDER, YOO
               & BRILL L.L.P.

8              Attorneys for Debtor and
              Debtor in Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF CHRISTOPHER CAMPBELL

I, Christopher Campbell, declare under penalty of perjury under the laws of the United States of America that the following statements are true and based upon personal knowledge.

### A.    Declarant Qualifications

1.    I am over 18 years of age. I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.    I am currently employed as the Chief Executive Officer and Chief Financial Officer of Shilo Management Corporation ("SMC"), the entity that oversees operation and management of Shilo Inn hotels, including the hotel operated by Shilo Inn Killeen, LLC, the debtor and debtor in possession herein ("Debtor"). In addition, SMC is the Manager of the Debtor.

3.    I hold an MBA from Golden Gate University (2003). I also hold a BA in Business Administration from University of Washington (1992). Both degrees were awarded to me with high honors and a concentration in finance.

4.    I was hired as Deputy Chief Financial Officer of Shilo Inns on March 1, 2003. My duties in such capacity including overseeing accounting functions and management of staff, including in-house payroll, purchasing, accounts payable and general ledger departments.

5.    On June 1, 2004, I was promoted to Chief Financial Officer of Shilo Inns. In such capacity, I oversee all accounting functions and provide management and third parties with historical and proforma financial information. On April 17, 2007, I was promoted to Chief Executive Officer of Shilo Inns and continue to serve in such capacity while also serving as the CFO.

## B.    Background

6.    The Debtor is a limited liability company formed under the laws of the state of Oregon.  The Debtor operates a 160 all-suite full-service hotel located in Killeen, Texas (the "Hotel") pursuant to a franchise agreement with Shilo Franchise International, LLC ("SFI"). The Hotel is a full-service all-suites hotel with half the suites being full kitchen suite units. The Shilo hotel amenities includes a guest hospitality lounge, business center, large meeting and banquet facilities, indoor pool and spa, fitness center, steam room, sauna, as well as an outdoor spa, offices, restaurant, lounge and one of the only deluxe cigar bars in the Killeen area.

7.    Mark S. Hemstreet has been the proud owner and president of the Shilo Inn Suites Hotel chain since 1974. Today, there are 41 Shilo Inn hotels across ten western states.    Mr. Hemstreet personally developed this particular Killeen 160 all-suite, full service Hotel in 2007.

8.    Cathay Bank ("Cathay") is the Debtor's primary secured creditor.  Cathay asserts a claim that arises out of a loan made by Cathay to the Debtor (the "Cathay Loan") evidenced by the Note (defined below) and secured, in part, by the Hotel and the revenue from the Hotel. Specifically, Cathay owns a Term Note dated as of December 11, 2007, in the original principal amount of $15,500,000.00 (the "Note") payable to Cathay's order and executed by the Debtor. The Debtor executed, in part, the following agreements to govern, evidence, or secure the Note and the Cathay Loan evidenced by the Note: (i) a Letter Loan Agreement ("Letter Loan Agreement") executed by the Debtor and Cathay, (ii) a Deed of Trust, Absolute Assignment of Rents, Security Agreement and Financing Statement, dated as of December 11, 2007 ("Deed of Trust") executed by the Debtor, and (iii) an Absolute Assignment of Rents, dated as of December 11, 2007 ("Rental Assignment")(collectively, the Note, the Deed of Trust, the Letter Loan Agreement, and the Rent Assignment, together with all other documents that evidence, secure or govern the Cathay Loan or the Note, are referred to herein as the Cathay Loan Documents").  Hemstreet executed a guaranty agreement with respect to the Note, the Cathay Loan Documents and the Cathay Loan, subject to the terms thereof.

9.    In 2009, the Hotel suffered reduced occupancy and revenues as a result of the slowdown in the general economy, especially the tourist and conference industry, during this long, deep historical recession.  Although the Hotel has begun to recover in 2010 with revenues up year-to-date through the end of November 2010, room revenues are still down approximately 3% from their 2008 levels for the first 11 months of 2010 compared to the same 11-month period in 2008.

10.    For various reasons, including without limitation, the general downturn in the economy, commencing in December 2009, the Debtor was unable to timely make the required payments of principal and interest due and owing to Cathay and defaulted.  The Debtor and Cathay discussed various alternatives but were unable to reach an agreement regarding a long-term restructuring of the loan.  Cathay posted the Hotel for a foreclosure sale to occur in December 2010.  The Debtor commenced this case to stay the foreclosure sale. Other than the foreclosure effort by Cathay, the Debtor had no reason to commence this bankruptcy case.

11.    Cathay also owns a separate note secured by the hotel project owned by the Debtor's affiliate (and related Chapter 11 debtor), Shilo Inn, Diamond Bar, LLC ("Diamond Bar") a debtor in Case No. 2:10-bk-60884-VZ ("Diamond Bar Case").  This settlement does not affect the rights and remedies of the parties related to Diamond Bar and the Diamond Bar case and the rights of Cathay, Diamond Bar and Mr. Hemstreet with respect to the Diamond Bar Case are expressly reserved and unaffected by this Motion.

## C.    Events During Bankruptcy

12.    As of the commencement of the Debtor's bankruptcy case and thereafter, the parties were adversarial, including in connection with the Debtor's initial request for use of cash collateral, Cathay's request to transfer venue of the case to Texas, and the Debtor's proposed plan of reorganization.  Other than Cathay, no other creditors have taken an active role in this case or appear at any hearings related thereto.

13.    Notwithstanding the foregoing, the Debtor and Cathay engaged in settlement

discussions.   Initially, the parties agreed to the terms of use of cash collateral, which was approved by the Court.

14.    Cathay then objected to the Debtor's proposed disclosure statement.   Cathay made clear that it intended to vote against and object to the Debtor's proposed plan of reorganization. Over the course of the last two months, Cathay and the Debtor discussed a global resolution of this case and the terms of payment of Cathay's claim.   After extensive arms- length negotiations, the parties have reached the terms of a settlement which resolves the necessity for this case and allows the Debtor to seek dismissal of this case.

**D.    Settlement Agreement**

15.    Attached hereto as Exhibit "1" is a true and correct copy of a fully-executed Term Sheet describing the settlement terms, along with the approved forms of Modification Agreement and Reinstatement Agreement attached thereto (the "Agreement").

16.    I believe that the terms of the settlement, as incorporated into the Agreement, are fair, reasonable and will allow the Debtor to operate outside of bankruptcy.   Specifically, the Debtor's valuation shows that Cathay is oversecured.   Although Cathay may, arguably, assert default interest (at least for the pre-petition period), under the Agreement, no default interest is asserted.   The Agreement establishes the terms of payment of Cathay's claim.   Moreover, I believe the Agreement allows the Debtor to make payments to Cathay within the parameters and restrictions of the Debtor's existing cashflow, which my office prepared.   Finally, reaching a settlement, as opposed to continuing litigation, results in a definite resolution to a dispute, as opposed to uncertainties in litigation, without expenditure of hundreds of thousands of dollars on professionals and experts, which would constitute administrative expense claims of the estate.

**E.    Dismissal of Case**

18.    Based on the fact that the dismissal of this case is incorporated into the

1    Agreement, upon approval of the Agreement and subject to and upon the closing of the

2    Agreement, the Debtor seeks to dismiss this case forthwith, provided that the Agreement, and the

3    transactions, releases, payments and agreements consummated pursuant to the Agreement, shall

4    pursuant to the approval order survive dismissal of this case and remain in full force and effect

5
     thereafter.
6

7        19.    The only reason for this filing was the Debtor's dispute with Cathay.

8    Approximately 90% of unsecured debt is that of the Debtor's insiders and affiliates.  The Debtor

9    has remained relatively current with all other vendors and will continue to make payments to its

10   vendors, including those holding pre-petition claims.

11
         20.    The only other debt which is in substantial arrears is secured property tax liability,
12
     which is senior in priority to the position of Cathay and, therefore, adequately protected.
13
     Moreover, pursuant to the Agreement, the Debtor is required to repay outstanding secured
14
     property taxes over a period of four (4) months, which will bring the Debtor current with its
15
16   property tax obligations.

17       21.    Other than Cathay, no one else has taken an active role in this case.  I believe that

18   no creditor will be impaired by the dismissal of this case since the Debtor will continue to honor

19   all obligations of its vendors.  More importantly, without the additional administrative costs

20   associated with a bankruptcy proceeding, I believe that the Debtor will be in a stronger cash flow

21   position to satisfy the obligations of its creditors.  Based on the foregoing, I believe that

22   settlement and dismissal of the case is a much better alternative for all creditors in light of the
23
     settlement with Cathay.
24

25   ///

26   ///

27   ///
28

22.    Based on the foregoing, and exercising my business judgment, I believe that the approval of the Agreement, including the dismissal of this case, is in the best interest of the estate and all creditors and should be approved by the Court.

Executed on this 1st day of August 2011, at Portland, Oregon.

CHRISTOPHER CAMPBELL

# EXHIBIT 1

July 22, 2011

TERM SHEET

Re:   Loan ("Killeen Loan") by Cathay Bank to Shilo Inn Killeen, LLC ("Killeen");

In re Shilo Inn, Killeen, LLC, Bankruptcy Case No. 10- 62057 ("Killeen Case").

This is a term sheet ("Term Sheet") that outlines the potential terms of a settlement (the "Killeen Settlement") of the various disputes and claims among Cathay Bank, Killeen and Mark Hemstreet (collectively, the "Parties") in the Killeen Case. This Term Sheet is non-binding, is solely for purposes of discussion, and is not an offer, commitment, or proposal by any of the Parties to enter into a transaction that may be accepted by any of the other Parties. Each of the Parties reserve their respective rights. Further, each of the Parties agrees and acknowledges that any Killeen Settlement is subject to: (i) execution of definitive agreements that contain terms, agreements, conditions, acknowledgments and representations for a loan reinstatement and settlement independently acceptable to Cathay Bank and acceptable to Killeen, and (ii) approval of the Killeen Settlement by the Bankruptcy Court by means acceptable to all Parties. All Parties acknowledge that the form and content of the definitive agreements for the Killeen Settlement, and the further terms, agreements, conditions, acknowledgments and representations contained therein, are important aspects of the Killeen Settlement; provided however, that such definitive agreements shall incorporate the material economic terms described in this Term Sheet. The controlling substantive forms of the respective definitive modification agreement and the definitive settlement and loan reinstatement agreement approved by the Parties for the Killeen Settlement are attached as Exhibit A hereto, subject to filling in blanks or open dates consistent with these definitive agreements. Upon execution of this Term Sheet by each of the Parties, Killeen will seek approval of the Killeen Settlement and such definitive agreements by the Bankruptcy Court and with all Parties reserving their rights. This Term Sheet expires and is terminated on July 22, 2011, unless this Term Sheet is executed before July 22, 2011, by each of Cathay Bank, Killeen and Mark Hemstreet in the space provided below. All prior term sheets and versions of the Killeen Settlement sent in letters to Killeen are withdrawn and terminated.

This Term Sheet, as well as any related discussions, are settlement communications for settlement purposes only. Without limiting the foregoing, because this is a settlement communication, neither Cathay Bank nor Killeen makes any admission concerning the value of Cathay Bank's collateral.

The outline of the Killeen Settlement for purposes of resolving all issues related to the Killeen Case and the Killeen Loan is as follows:

1.    Effectiveness; Dismissal of the Killeen Case: The Killeen Settlement and dismissal of the Killeen Case must be approved by order of the Bankruptcy Court ("Approval Order") entered by August 29, 2011, and such Approval Order must be a final non- appealable order and the Killeen Settlement closed and consummated by September 23, 2011 (collectively the "Closing") or this Term Sheet and all obligations herein are terminated; provided however, that the Parties

Term Sheet
July 22, 2011

may extend the foregoing deadlines by a mutual written agreement.    Killeen shall file a motion seeking approval of the Killeen Settlement and, subject thereto and occurrence of the Closing, dismissal of the Killeen Case. The transactions contemplated by the Killeen Settlement will be effective as of August 1, 2011 (August 1, 2011 is the "Effective Date"). After the Killeen Settlement is approved by the Bankruptcy Court and Closing is completed, the Killeen Case shall be dismissed, per the Bankruptcy Court's Approval Order, provided that the transactions, releases, payments and agreements consummated pursuant to the Killeen Settlement shall pursuant to the Approval Order survive dismissal of the Killeen Case and remain in full force and effect thereafter.

2.     Reinstatement of Loan Documents and Liens; Definitive agreements:

The motion and approval process must be acceptable to all Parties. At Closing, Killeen will execute definitive agreements to reflect the Killeen Settlement acceptable to all Parties. The existing Killeen note, the related deed of trust and the other related Killeen loan documents shall remain in place and be reinstated and affirmed by Killeen, modified only to reflect the term of the Killeen Settlement. All liens and security interest shall be affirmed and be first and senior priority to secure the Claim and the Killeen Loan and Killeen Loan documents and Cathay Bank may make any required or desired filings.

Cathay Bank's costs, expenses and legal fees incurred prior to May 31, 2011 are allowed and will be paid as set forth in sections 3 and 4 below.

Killeen will pay $20,000 to Cathay Bank at Closing (the "$20,000 Closing Fee Payment") to reimburse Cathay Bank for the legal fees and costs of Cathay Bank incurred after May 31, 2011: (i) in preparing the definitive agreements and/ or seeking approval of the Killeen Settlement by the Bankruptcy Court, including the costs of recording and title policy endorsements; and (ii) in connection with the Existing Hemstreet Killeen Guaranty Lawsuit (defined below) through the Closing; provided however, that such $20,000 limitation upon reimbursement of Cathay Bank's fees and costs does not apply absent Closing of the Killeen Settlement and does not apply to fees and costs incurred by Cathay Bank, if any, after and apart from the Closing (for example, fees and costs incurred as a result of a subsequent default by Killeen under the Killeen Loan documents after Closing).

3.     Claim Amount:

Cathay Bank's claim ("Claim") under the Killeen Loan, the Killeen note and the Killeen Loan documents shall be allowed in the aggregate sum of:

(i)     $15,751,975.93, including unpaid principal under the Killeen note ($14,902,868.33), accrued unpaid pre- petition interest owed under the Killeen note ($652,599.16), and Cathay Bank's pre- petition costs, expenses and legal expense ($101, 840.94) and pre- petition late charges ($94,667.50) (such charges and expenses an aggregate amount of $196,508.44), plus

Term Sheet
July 22, 2011

     (ii)     post- petition interest through August 1, 2011, on the unpaid principal balance of the Killeen note at the non-default contract rate (as a result, the aggregate accrued unpaid pre- and post- petition interest is projected to be approximately $1,232,908.58), plus

     (iii)     Cathay Bank's post- petition legal expense and costs, including costs of consultants, in the amount of $233,159.06 as of May 31, 2011 (meaning Cathay Bank's aggregate <u>allowed</u> pre- petition and post- petition legal fees and costs to be added to the allowed Claim shall be $335,000 as of May 31, 2011), <u>plus</u> $20,000 for the fees and costs incurred by Cathay Bank after May 31, 2011, and through Closing in connection with negotiating, obtaining approval of and then consummating the Killeen Settlement in the Killeen Case (as set forth in Section 2 above).

4.    <u>Terms of Payment of the Claim</u>:

     Cathay Bank's allowed Claim will be paid in two parts as described below: (i) the first part is the unpaid principal balance of the Killeen note, plus interest after August 1, 2011, and (ii) the second part is the accrued unpaid interest and late charges through August 1, 2011, and Cathay Bank's costs and expenses (legal and consultants) incurred through Closing.

     (i)    <u>Unpaid principal of the Killeen note</u>: On the Effective Date and as of the Closing, after applying all prior payments, the Killeen note will have an unpaid principal balance of $14,902,868.33. The Killeen note will have two payment components (Component A and Component B) with respect to principal that, along with accrued interest after the Effective Date, will be paid in cash in full according to the following terms:

Component A

* Principal balance: $8,125,000.00.
* Interest Rate: Non-default rate of 5.5 percent per annum starting and after August 1, 2011; default rate as set forth in the Killeen note. Accrued unpaid interest paid monthly.
* Principal payments: (i) $3,957.50 per month commencing with a payment due and owing on September 1, 2011, through August 1, 2012, (ii) $23,957.50 per month commencing with a payment due and owing on September 1, 2012, and each month through the maturity date; and (iii) all unpaid principal payable on maturity date or upon acceleration.
* Maturity date: Non-default maturity date of August 1, 2016.
* Payments due on the 1st day of each month, starting September 1, 2011.  Interest accrues starting August 1, 2011.

Component B

* Principal balance: $6,777,868.33.
* Interest Rate: Non-default rate of 3.5 percent per annum starting and after August 1, 2011; default rate as set forth in the Killeen note. Accrued unpaid interest paid monthly.
* Principal payments:  Unpaid principal payable on maturity date or upon acceleration.
* Maturity date:  Non-default maturity date of August 1, 2016.

Term Sheet
July 22, 2011

\* Payments due on the 1st day of each month, starting September 1, 2011. Interest accrues starting August 1, 2011.

Accordingly, with respect to these two components A and B, the following monthly payments will be due and owing each month (each, a "Monthly Killeen Note Payment"): (i) commencing on September 1, 2011, and through the payment due on August 1, 2012, a payment of principal and interest shall be due and owing each month under the Killeen note, calculated based on the terms set forth above; and (ii) commencing September 1, 2012, a payment of principal (the monthly principal payment increases by $20,000 per month) and interest shall be due and owing each month under the Killeen note, calculated based on the terms set forth above. The actual dollar amount of the foregoing monthly payments will be calculated by Cathay Bank and agreed as part of any agreement. Failure to pay any Monthly Killeen Note Payment shall be a default under the Killeen Loan documents. All payments will be made by wire transfer. There shall be a ten (10) day grace period after the due date (not after default notice) for the Monthly Killeen Note Payment before a default occurs under the Killeen note.

    (ii)    Accrued interest, late charges, attorneys' fees and costs through August 1, 2011: At Closing, Killeen will pay $100,000 (the "$100,000 Closing Payment") to be applied towards accrued unpaid interest (pre- or post-petition interest) due and owing under the Killeen note through August 1, 2011. At Closing, Killeen will pay the $20,000 Closing Fee Payment to Cathay Bank. Killeen shall make five post- petition cash collateral payments through August 5, 2011/ Closing (each payment being $46,500), that shall be applied to post- petition interest through August 1, 2011 (the aggregate amount of such payments is assumed for the Killeen Settlement to be $232,500). The remaining unpaid balance of accrued unpaid interest and late charges through the Effective Date, and Cathay Bank's costs and expenses accrued through Closing, will be paid as follows:

\* Projected balance after applying the $100,000 Closing Payment, the $232,500 cash collateral payments and the $20,000 Closing Fee Payment: $1,330,076.08.

\* Monthly payments of $7,000 (each, a "Monthly Accrued Balance Payment").
\* First monthly payment due September 1, 2011.
\* In addition to the Monthly Accrued Balance Payments and separate and distinct from all other payments required to be made by Killeen, a one- time payment of $50,000 no later than August 1, 2012 ($50,000 Payment").
\* Balloon payment of unpaid balance due and owing on August 1, 2016.

The $20,000 Closing Fee Payment, $100,000 Closing Payment, Monthly Accrued Balance Payments and $50,000 Payment are in addition to the Monthly Killeen Note Payments. Failure to pay any required Monthly Accrued Balance Payment or the $50,000 Payment is a default under the Killeen Loan document. The obligation to pay these sums will be reflected in a definitive agreement and secured by the Killeen Loan documents.

5.    Fees: Modification fee of $100,000 earned now and payable at maturity, unless the Killeen note is paid in full, without default, by August 1, 2014. Prepayment penalty to be fixed

at one percent unless the Killeen note is paid in full, without default, before August 1, 2014, in which case no prepayment penalty will be due and payable.

6.    Subordination:    Killeen, Shilo manager and the Shilo franchisor shall execute a subordination agreement in favor of Cathay Bank regarding any fees or amounts owed to the Shilo entities.  Under the agreement, the pre-petition fees or amounts owed to Shilo- or Killeen-related parties under management agreement and franchise agreement: (i) may not be paid until the $100,000 Payment and $50,000 Payment are each paid in full to Cathay Bank, (ii) thereafter may be paid in monthly increments so long as no default exists under the Killeen Loan documents and Killeen is current with payables,  and (iii) may not be paid after any default under the Killeen Loan documents.  On a go-forward basis after Closing, the normal and reasonable monthly management fee (of 4% of total revenue) and franchise fee (of 4% of room revenue) may be paid monthly so long as: (i) no default exists under the Cathay Loan documents, and (ii) Killeen is current with payables.  The fees shall not be increased without the consent of Cathay Bank.  Effective December 1, 2010, no fees, equity distributions or loans may be made to or for the benefit of Mr. Hemstreet, any Shilo entity, or any other affiliate or entity controlled directly or indirectly by Mr. Hemstreet, other than the permitted monthly payments under the franchise agreement and management agreement or as provided in section 12 below.   An officer or LLC manager of Killeen shall provide a certificate to Cathay Bank each month with the required reporting discussed below certifying compliance with this requirement each month.  A violation of this prohibition or the failure to timely provide the certificate shall be an event of default under the Killeen Loan documents.

7.    Guaranty:  Mr. Hemstreet will ratify and continue his existing guaranty related to the Killeen Loan and Killeen Loan documents.  Mr. Hemstreet shall provide a personal financial statement within 60 days of fiscal year end and his tax return within 15 days after filing.  Mr. Hemstreet shall pay Cathy's Bank's legal fees and costs incurred in the lawsuit against Mr. Hemstreet based upon his existing guaranty related to the Killeen Loan and the Killeen Loan documents (a lawsuit now pending in Texas federal court, and referred to as the "Existing Hemstreet Killeen Guaranty Lawsuit")(as part of the Killeen Settlement, such fees and costs through Closing are subsumed in the allowed amounts identified in sections 2 and 3 above).  The Existing Hemstreet Killeen Guaranty Lawsuit related only to the Killeen Loan shall be dismissed without prejudice upon Closing.  The Killeen Settlement does not affect or apply to the Diamond Bar Loan (defined below) or the lawsuit against Mr. Hemstreet based upon his guaranty agreement for the Diamond Bar Loan.  Without waiver or relinquishment by Cathay Bank of any required internal or external approval outlined in this letter or any other term or condition of this letter or the Killeen Settlement, Cathay Bank, Killeen and Mr. Hemstreet will reasonably cooperate in the Existing Hemstreet Killeen Guaranty Lawsuit to submit to the Texas federal court a proposed scheduling order to defer any pending deadlines in such lawsuit for approximately 60-75 days after June 10, 2011 (or for such period as otherwise agreed by the parties and approved by the Texas federal court) in order to reduce expense during the period while the Killeen Settlement is considered for approval by Cathay Bank and, if ever applicable, while Killeen seeks approval by the Bankruptcy Court of the Killeen Settlement and the definitive agreements (all parties recognize, acknowledge and agree that the ultimate scheduling decisions in this guaranty lawsuit shall be determined by the Texas federal court).

Term Sheet
July 22, 2011

8.    Release: Killeen and Mr. Hemstreet waive and release all claims and causes of action against Cathay Bank and its officers, directors, employees, agents, representatives, affiliates, and attorneys related to Killeen, the Killeen Loan, the Killeen Loan documents and the events, acts and circumstances related to Killeen.  Killeen waives and releases all objections, disputes and avoidance rights regarding Cathay Bank's claim, security interests and liens.  Under the Killeen Settlement, Diamond Bar (defined below) and Mr. Hemstreet do not release claims and causes of action that relate to Diamond Bar and the Diamond Bar Loan against Cathay Bank and its officers, directors, employees, agents, representatives, affiliates, and attorneys.

9.    Reporting (in addition to requirements of the Killeen Loan documents):

Monthly reporting by the 30th of each month for the prior month: balance sheet, income statement, cash flow statement, end of the month Daily Report, all certified by an officer or LLC manager of Killeen.

Annual: CPA- prepared Year- end balance sheet, income statement, cash flow statement within 60 days of FYE along with a one-year projected (on a monthly basis) balance sheet, income statement and cash flow statement.  If a CPA will not be used, then Cathay Bank may retain a consultant to review books and records twice annually and Killeen will reimburse Cathay Bank for such cost (not to exceed $2,500 annually).  The two-per-year and $2,500 annual limit will not apply after a default under the Killeen Loan documents.

Copy of Borrower annual tax returns within 15 days of filing.

10.    Property taxes: All past due (2010 or earlier) property taxes must be paid in four equal monthly installments commencing September 1, 2011.  Any failure to pay property taxes is a default under the Killeen Loan documents.  Obtaining a loan secured by a tax lien or other senior lien to pay the property taxes is not allowed and shall be a default under the Killeen Loan documents.

11.    Title policies: This Killeen Settlement is subject to the title company issuing a modification endorsement and confirming that the existing title policy is not impaired.

12.    Excess Cash Flow:  So long as the conditions below are satisfied, "excess cash" may be paid annually (no sooner than for cash generated in calendar year 2012) calculated as follows:(i) 60 percent distributed to equity owners, and (ii) 40 percent paid to Cathay Bank to be applied to the unpaid principal balance of the Killeen note.  The cash flow payment to Cathay Bank shall be applied to the last payment of principal under the B component of the Killeen note and does not reduce any monthly payment under the Killeen note.

Generally, and subject to the definitive agreements, "excess cash" is the actual cash remaining at calendar year end (Dec. 31) after: (i) Killeen actually pays, or fully reserves and impounds in a segregated account for and then timely pays, all unpaid property taxes for the Hotel for that year and any prior year (i.e. excess cash flow in 2013 is calculated after paying property taxes for the year 2013), (ii) Killeen pays, and prudently reserves cash to pay, all operating expenses and other expenses, taxes and payables of the Hotel and Killeen (and not less

31

Term Sheet
July 22, 2011

than the amount needed to operate as set forth in the projections and pay debt service), and (iii) Killeen retains adequate cash reserves to operate the Hotel in accordance with the Killeen Loan documents and good practices (and not less than the amount needed to operate as set forth in the projections and pay debt service). The bottom line: Killeen cannot pay excess cash to equity if operations will be impaired by a lack of cash.

The conditions precedent to any excess cash payment are:

\* Killeen must send new five year projections that include the new payment schedule to Cathay Bank and that are acceptable to Cathay Bank, which the Parties acknowledge have been sent to Cathay Bank on July 8, 2011 and which Cathay Bank acknowledges are acceptable for purposes of the Settlement.

\* the $100,000 Closing Payment, $20,000 Closing Fee Payment and $50,000 Payment (as described above) must be paid to Cathay Bank;

\* there must be no default under the Killeen Loan documents;

\* payments no sooner than for the calendar year 2012; and

\* Killeen gives Cathay Bank ten days prior written notice of any such payment.

13. <u>Diamond Bar Loan</u>:  This Killeen Settlement does not affect or apply to: (i) the loan ("<u>Diamond Bar Loan</u>") made by Cathay Bank to Shilo Diamond Bar, LLC ("<u>Diamond Bar</u>") or any loan made by Cathay Bank other than the Killeen Loan, or (ii) the bankruptcy case styled In re Shilo Inn, Diamond Bar, LLC,  Bankruptcy Case No. 10-60884 ("<u>Diamond Bar Case</u>"), or (iii) the respective rights, claims and remedies of the Parties in connection with the Diamond Bar Loan, any loan other than the Killeen loan, or the Diamond Bar Case.

[SIGNATURES ON FOLLOWING PAGE(S)]

Term Sheet
July 22, 2011

**CATHAY BANK:**

CATHAY BANK, a
California banking corporation

By: _____
Name: _____
Title: _____

**BORROWER:**

SHILO INN, KILLEEN, LLC, an
Oregon limited liability company

By: _____
Name: _____
Title: _____

**GUARANTOR:**

_____

MARK S. HEMSTREET

Term Sheet
July 22, 2011

**CATHAY BANK:**

CATHAY BANK, a
California banking corporation

By: _____
Name: _____
Title: _____

**BORROWER:**

SHILO INN, KILLEEN, LLC, an
Oregon limited liability company *by Shilo Management Corp., manager*

By: *Christopher Campbell*
Name: *Christopher Campbell*
Title: *Secretary*

**GUARANTOR:**

*Mark S. Hemstreet*

MARK S. HEMSTREET

# EXHIBIT A

Term Sheet
July 22, 2011

## EXHIBIT A

[attached]

When Recorded, Return To:
Locke Lord Bissell & Liddell LLP
100 Congress Avenue, Suite 300
Austin, Texas 78701
Attn: Tai Tran, Esq.

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## MODIFICATION AGREEMENT

| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF BELL | § |

**THIS MODIFICATION AGREEMENT** ("Agreement") is entered into to be effective this 1st day of August, 2011 (the "Effective Date"), by and between CATHAY BANK, a California banking corporation ("Lender"), SHILO INN, KILLEEN, LLC, an Oregon limited liability company, ("Borrower"), and MARK S. HEMSTREET, an individual ("Guarantor").

## R E C I T A L S:

A.    Lender is the sole owner and holder of that certain Term Note dated December 11, 2007 (the "Closing Date"), executed by Borrower and payable to the order of Lender in the original principal amount of Fifteen Million Five Hundred Thousand and No/100 Dollars ($15,500,000.00) (being hereby referred to as the "Original Note").

B.    The Original Note was issued pursuant to that certain Letter Loan Agreement dated as of the Closing Date (which, as it may have been amended, modified, supplemented or restated, is herein called the "Original Loan Agreement") among Borrower, Lender and Guarantor. The Original Note is secured by, among other security: (i) a Deed of Trust, Absolute Assignment of Rents, Security Agreement and Financing Statement executed by Borrower to Anthony M. Tang, Trustee, for the benefit of Lender, dated as of the Closing Date (which, as it may have been amended, modified, supplemented or restated, is herein called the "Original Deed of Trust"), filed for record under Instrument No. 2007-00053214 of the Real Property Records of Bell County, Texas (the "Recorder's Office"), covering certain real property located in said county as more particularly described in the Original Deed of Trust (the "Property"), and (ii) an Absolute Assignment of Rents covering the Property executed by Borrower for the benefit of Lender, dated as of the Closing Date (which, as it may have been amended, modified, supplemented or restated, is herein called the "Assignment"), filed for record under Instrument No. 2007-0053215 in the Recorder's Office. Further, Guarantor executed a Guaranty Agreement in favor of Lender dated as

AUS:0053676/00101:446530v9

of December 11, 2007 (which, as it may have been amended, modified supplemented or restated, is herein called the "Original Guaranty").

C.      The Original Note, the Original Loan Agreement, the Original Deed of Trust, the Assignment, the Original Guaranty, and all other documents evidencing, securing, guaranteeing, indemnifying or governing the loan evidenced by the Original Note (the "Loan"), are hereafter collectively referred to as the "Existing Loan Documents".

D.      On December 6, 2011 ("Petition Date"), the Borrower filed a voluntary petition commencing a bankruptcy case under chapter 11 of the United States Bankruptcy Code, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California ("Bankruptcy Court"). The Borrower's bankruptcy case is assigned case no. 2:10-bk-62057-VZ ("Killeen Bankruptcy Case") and is jointly administered with bankruptcy case no. 2:10-bk-60884-VZ (the "Diamond Bar Bankruptcy Case") of debtor Shilo Inn, Diamond Bar, LLC ("Diamond Bar"). Borrower is a debtor in possession in the Killeen Bankruptcy Case.

E.      Pursuant to the terms of that certain Settlement and Loan Reinstatement Agreement by and among Borrower, Guarantor and Lender, dated of even date herewith (the "Reinstatement Agreement"), Borrower, Guarantor and Lender have agreed to modify certain provisions of the Existing Loan Documents, as hereinafter provided. A "Closing" (as defined in the Reinstatement Agreement) is scheduled for August ____, 2011. [Note: this date to be filled at the Closing].

NOW, THEREFORE, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the parties hereby agree as follows:

1.      *Acknowledgment of Outstanding Balance*. The parties hereto acknowledge that, as of the Effective Date, the outstanding principal balance of Portion A (as herein defined) is $8,125,000.00. The parties hereto acknowledge that, as of the Effective Date, the outstanding principal balance of Portion B (as herein defined) is $6,777,868.33. The parties further acknowledge and agree that, as of the Effective Date, the balance and allowed amounts of accrued and unpaid interest, costs, expenses and charges are as set forth in the Reinstatement Agreement. Lender shall have no obligation whatsoever to make any advances, overadvances, or other extensions of credit to Borrower under the Original Loan Agreement, the Original Note, any other Existing Loan Documents or otherwise from and after the date hereof, and that all proceeds of the Loan have been funded fully as of the date hereof, and Lender has no further funding obligations under the Original Note, the Existing Loan Documents or this Agreement.

2.      *Conditions Precedent to Loan Modification*. The obligation of Lender to agree to and close on the modifications as hereinafter provided is subject to and conditioned upon:

(a)      Lender's receipt at the Closing of a payment in the amount of One Hundred Thousand and No/100 Dollars ($100,000.00) ("$100,000 Closing Payment"), which shall be considered fully earned by Lender as of the date hereof. The $100,000 Closing Payment

shall be applied towards accrued and unpaid interest due and owing under the Loan as of the Effective Date.

(b)     Lender's receipt at the Closing of an additional payment in the amount of Twenty Thousand and No/100 Dollars ($20,000.00) (the "$20,000 Closing Fee Payment"), which shall be considered fully earned by Lender as of the date hereof. The $20,000 Closing Fee Payment is to reimburse Lender for all fees and costs (including legal fees) incurred by Lender after May 31, 2011: (i) in preparing this Agreement, the Reinstatement Agreement and all other definitive agreements as required by the Reinstatement Agreement for Closing and/or seeking approval of this Agreement and the Reinstatement Agreement by the Bankruptcy Court, including the costs of recording this Agreement and modification endorsement to the Title Policy as required herein, and (ii) in connection with the existing lawsuit filed by Lender against Guarantor, styled *Cathay Bank v. Mark Hemstreet*, initially filed as Cause No. 2011-07146 in the 333rd Judicial District Court, Harris County, Texas, and, after removal by Guarantor, now pending as Civil Action No. 4:11-cv-1666 in the United States District Court, Southern District of Texas, Houston Division (the "Guarantor Lawsuit"), through the date of this Agreement and the dismissal without prejudice of the Guarantor Lawsuit pursuant to the Reinstatement Agreement; provided, however, that the $20,000 Closing Fee Payment shall not apply to limit, or serve as a maximum cap of any fees and costs which may be incurred by Lender after the date of Closing including, without limitation, fees and costs incurred as a result of any breach or default under the Loan Documents or the Guaranty after the date of Closing.

(c)     Prior to or at the Closing, Lender shall have received from Borrower five (5) post-petition cash collateral payments totaling Two Hundred Thirty-Two Thousand Five Hundred and No/100 Dollars ($232,500.00) in the aggregate (the "$232,500 Cash Collateral Payments"), which shall be applied towards accrued and unpaid post-petition interest due and owing as of the Effective Date.

(d)     a modification fee in the amount of One Hundred Thousand and No/100 Dollars ($100,000.00) (the "Modification Fee"), which Modification Fee shall be considered fully earned by Lender as of the date hereof, subject to the terms hereof. Notwithstanding the foregoing, the Modification Fee shall be deferred and fully due and payable on the Maturity Date (as herein modified); provided, however, that in the event the entire unpaid principal balance of the Note, together with all accrued and unpaid interest on the unpaid principal balance of the Note, is paid in full, without default, before August 1, 2014, then the Modification Fee shall not be due and payable and Lender shall then agree to waive Borrower's obligation to pay such Modification Fee.

(e)     Lender shall have received from American Abstract & Title Co. (the "Title Company") a pro-forma modification endorsement to that certain Texas Mortgagee Policy of Title Insurance issued by the Title Company to Lender on December 18, 2007 as Policy No. 509105M (the "Title Policy"), in form and content acceptable to Lender, with the final, executed endorsement issued by the Title Company within a commercially reasonable period of time from and after the date hereof.

3

(f)   all parties required to execute this Agreement, the Reinstatement Agreement, or any of the related Loan modification documents shall have executed and delivered to Lender original counterparts of same and shall have caused such documents to be dated as of the date hereof.

(g)   the occurrence of each of the following "Approval Order Conditions" (as defined in the Reinstatement): (i) the approval of the Reinstatement Agreement and this Agreement by the Bankruptcy Court through entry of the Approval Order (as defined in the Reinstatement Agreement) by no later than August 29, 2011, and (ii) the Approval Order becomes a Final Order (as defined in the Reinstatement Agreement) by no later than September 23, 2011; provided however, that Lender may waive the requirement of a Final Order and either of the foregoing deadlines in its sole discretion. If the Approval Order Conditions are not timely satisfied or waived, then Lender is not obligated to enter into this Agreement.

3.   *Payment of Remaining Balance of Interests and Costs*. After application of the $100,000 Closing Payment, the $20,000 Closing Fee Payment, and the $232,500 Cash Collateral Payments, the remaining unpaid balance of accrued unpaid interest together with late charges and Lender's costs and expenses due and owing under the Note and the Loan Documents as of the Effective Date, is the aggregate sum of $1,330,076.08 (such sum, the "Remaining Balance of Interest and Costs"), which shall be paid as follows:

(i)   a monthly payment of $7,000.00 (each, a "Monthly Accrued Balance Payment") shall be due and payable on September 1, 2011, and on the first (1st) day of each calendar month thereafter (each, a "Payment Due Date");

(ii)   in addition to the Monthly Accrued Balance Payments and separate and distinct from all other payments required to be made by Borrower, a one-time payment of $50,000.00 shall be due and payable no later than August 1, 2012 (the "$50,000 Payment"); and

(iii)   on the Maturity Date (as herein modified), the entire unpaid balance of the Remaining Balance of Interest and Costs shall then be fully due and payable (in addition to all other amounts which may be due and owing at that time under the Loan including, without limitation, all unpaid principal and accrued interest due and owing under the Note).

Borrower acknowledges and agrees that Borrower's obligation to pay the $100,000 Closing Payment, the $20,000 Closing Fee Payment, the $232,500 Cash Collateral Payments, the Monthly Accrued Balance Payments, and the $50,000 Payment are in addition to the monthly principal and interest payments required to be paid by Borrower under the Note (as modified hereby).

Borrower and Guarantor acknowledge and agree that Borrower's obligation to pay the Remaining Balance of Interest and Costs is valid and enforceable, and is not subject to objection, contest, avoidance, disallowance, offset, reduction or defenses. Borrower and Guarantor further

acknowledge and agree that (i) Borrower's obligation to pay the Remaining Balance of Interest and Costs is fully secured by the liens of the Deed of Trust and other Loan Documents, which liens are valid, enforceable and constitute first priority liens, security interests and rights in the Property described therein, and (ii) such Property is free and clear of liens, interests, claims and encumbrances other than the liens, interests, claims and encumbrances evidenced by the Loan Documents (and other than liens in favor of taxing authorities having jurisdiction over the Property which secure ad valorem taxes existing as of August 1, 2011). Borrower and Guarantor agree that a failure to pay (or a default in payment of) any portion of the Remaining Balance of Interest and Costs in accordance with the terms hereof shall constitute an event of default under the Loan Documents.

4.  *Original Note "Portion" Agreement.* (a)     From and after the Effective Date, "Portion A" of the outstanding principal balance of the Loan shall mean the amount of Eight Million One Hundred Twenty Five Thousand and No/100 Dollars ($8,125,000.00). Notwithstanding the fixed interest rate set forth in Section (a) of the first (1st) paragraph of the Original Note, interest on Portion A shall accrue at a rate of five and one-half of one percent (5.5%) after the Effective Date (unless an event of default occurs in which case the rate of interest applicable after an event of default shall apply).

(b)     Payments of all accrued unpaid interest after July 31, 2011, on Portion A shall be due and payable on the first day of each month commencing September 1, 2011, and continuing on each Payment Due Date thereafter, in accordance with the terms and conditions set forth in the Original Note. Notwithstanding the foregoing, in the event the Closing occurs after September 1, 2011, the payment of accrued unpaid interest which is due on September 1, 2011 shall be payable on the date of such Closing.

(c)     In addition to the interest payments on Portion A as set forth above, additional monthly principal payments each in the amount of Three Thousand Nine Hundred Fifty-Seven and 50/100 Dollars ($3,957.50) shall be due and payable on the first day of each month commencing on September 1, 2011, and continuing on each Payment Due Date thereafter until and including August 1, 2012, and shall be applied to the outstanding principal balance of Portion A on a monthly basis. Notwithstanding the foregoing, in the event the Closing occurs after September 1, 2011, the payment of accrued unpaid interest which is due on September 1, 2011 shall be payable on the date of such Closing. In addition to the interest payments on Portion A as set forth above, additional monthly principal payments of Twenty-Three Thousand Nine Hundred Fifty-Seven and 50/100 Dollars ($23,957.50) shall be due and payable on the first day of each month beginning on September 1, 2012, and continuing on each Payment Due Date thereafter until the Maturity Date (as herein modified), and shall be applied to the outstanding principal balance of Portion A on a monthly basis.

(d)     From and after the Effective Date, "Portion B" of the outstanding principal balance of the Loan shall mean the amount of Six Million Seven Hundred Seventy-Seven Thousand Eight Hundred Sixty Eight and 33/100 Dollars ($6,777,868.33). Notwithstanding the fixed interest rate set forth in Section (a) of the first (1st) paragraph of the Original Note, interest on Portion B shall accrue at a rate of three and one-half of one percent (3.5%) after the Effective Date (unless an

AUS:0053676/00101:446530v9

event of default occurs in which case the rate of interest applicable after an event of default shall apply).

(e)    Payments of all accrued and unpaid interest accrued after July 31, 2011, on Portion B shall be due and payable in on the first day of each month commencing on September 1, 2011, and continuing on each Payment Due Date thereafter, in accordance with the terms and conditions set forth in the Original Note; provided, however, that interest on Portion B shall accrue at a rate of three and one-half of one percent (3.5%) after the Effective Date (unless an event of default occurs in which case the rate of interest applicable after an event of default shall apply). Notwithstanding the foregoing, in the event the Closing occurs after September 1, 2011, the payment of accrued unpaid interest which is due on September 1, 2011 shall be payable on the date of such Closing.

(f)    On the Maturity Date (as herein modified), the entire unpaid principal balance of Portion A and Portion B, together with all accrued and unpaid interest on the unpaid principal balance of Portion A and Portion B, shall then be fully due and payable.

(g)    Section 4(e) of the Original Note is hereby deleted in its entirety.

(h)    Unless as modified herein, the provisions of the Original Note shall continue in full force and effect, and Borrower acknowledges and reaffirms to Lender its liability thereunder.

5.    *Additional Modification of the Original Note*.  After the date hereof, references in any of the Existing Loan Documents to the "Note" shall mean the Original Note, as modified by this Agreement.  From and after the date hereof, the following provisions of the Original Note are hereby amended and modified as follows:

(a)    The definition of "Maturity Date" set forth in Section 1(j) of the Original Note shall be modified to reflect a Maturity Date of August 1, 2016, and shall apply to both Portion A and Portion B of the Loan.  After the date hereof, references in the Original Note or any of the Loan Documents to the Maturity Date shall mean the Maturity Date, as herein modified. Furthermore, as set forth above, on the Maturity Date (as herein modified), the entire unpaid balance of the Remaining Balance of Interest and Costs shall be fully due and payable (in addition to all other amounts which may be due and owing at that time under the Loan including, without limitation, all unpaid principal and interest due and owing under the Note).

(b)    Section 19 of the Original Note shall be deleted in its entirety and replaced with the following:

"Section 19.    **Prepayment**.  If Maker prepays the entire principal balance of this Note prior to maturity, Maker shall pay to Payee a prepayment penalty in the amount of one percent (1%) of the principal being prepaid; provided however, that if the outstanding principal balance of the Note is repaid in full, without default, before August 1, 2014, then no such prepayment premium or fee shall be due and payable.

AUS:0053676/00101:446530v9

Provided, however, if such prepayment premium constitutes interest under applicable law, the amount of such prepayment premium will be reduced to any amount which, when added to all other amounts which constitute interest under applicable law, will not exceed the maximum amount of interest which may be contracted for, charged or received with respect to the loan evidenced hereby under applicable law for the actual period time such loan is outstanding."

References to the "entire principal balance" and "outstanding principal balance" of the Note above shall include the entire principal balance and the outstanding principal balance of both Portion A and Portion B, collectively.  Any prepayments shall be applied as follows:

      (i)     first to interest accrued on Portion B;

      (ii)    second, to the outstanding principal of Portion B;

      (iii)   third, to the Remaining Balance of Interest and Costs;

      (iii)   fourth, to interest accrued on Portion A; and

      (iv)   fifth, to the outstanding principal of Portion A.

     6.    *Modification of the Loan Agreement*.  After the date hereof, references in any of the Existing Loan Documents to the "Loan Agreement" shall mean the Original Loan Agreement, as modified by this Agreement.  From and after the date hereof, the following provisions of the Original Loan Agreement are hereby modified as follows:

     (a)    Section 5.2, Article V of the Original Loan Agreement, titled "Reporting Requirements" is hereby deleted in its entirety and replaced with the following:

"Within (15) days of the filing date, copies of the filed federal income tax returns of Borrower and Guarantor for the previous year, and within sixty (60) days of Borrower's corporate fiscal year end, annual financial statements of Borrower and Guarantor as prepared by a certified public accountant (including a balance sheet, income statement, and cash flow statement for the immediately preceding year), along with a one (1) year projected (on a monthly basis) balance sheet, income statement and cash flow statement for both Borrower and Guarantor."

     (b)    Article V of the Original Loan Agreement, titled "Reporting Requirements", is hereby modified to add the following Section 5.4 immediately following the existing Section 5.3, as follows:

"5.4  On a monthly basis, no later than the 30th day of the following month, the monthly balance sheet, Property income statement, Property cash flow statements, and each end-of-month report as reported in the "Daily Report" for the Property, each in form and substance acceptable to Bank."

Notwithstanding any provision of the Original Loan Agreement to the contrary, and without waiving Borrower's obligation to submit the aforementioned financial statements, if such financial statements that are submitted by Borrower and Guarantor are not prepared by a certified public

7

accountant, then Lender shall have the right to retain a consultant to review and/or audit the books and records of Borrower and/or Guarantor, as appropriate, provided that such reviews shall not be conducted more than two (2) times in any calendar year, and further provided that Lender shall be reimbursed by Borrower for the cost of engaging such consultant(s), not to exceed $2,500.00 annually. Notwithstanding the foregoing, the aforementioned twice per calendar year limitation on reviews and the $2,500.00 annual limitation on reimbursement shall not be applicable in the event a default or event of default shall have occurred under the Loan Documents.

7.   _Grace Period for Payment Defaults under Loan Documents_.  Notwithstanding any provision of the Loan Documents to the contrary, Borrower and Guarantor shall be entitled to a ten (10) day grace period for all monetary and/or payment defaults under the Loan Documents. Accordingly, Borrower's and/or Guarantor's failure to pay when due any sums due and payable under the Note or any of the other Loan Documents shall not ripen into an event of default under the Loan Documents (triggering Lender's right to enforce any and all of its remedies thereunder) unless and until such failure to pay or deposit shall continue for a period of ten (10) days after the due date.

8.   _Omnibus Amendment to the Existing Loan Documents_.  The Existing Loan Documents are hereby modified as follows:

(a)    After the date hereof, references in any of the Loan Documents to the "Loan Documents" shall mean such corresponding Existing Loan Document as modified, amended, and supplemented by this Agreement.

(b)    After the date hereof, references in any of the Loan Documents to the "Deed of Trust" shall mean the Original Deed of Trust, as modified, amended, and supplemented by this Agreement.

(c)    After the date hereof, references in any of the Loan Documents to the "Guaranty" shall refer to the Original Guaranty, as modified, amended, and supplemented by this Agreement.

(d)    Furthermore, commencing on the date of this Agreement, all payments required to be made under the Loan including, without limitation, the $100,000 Closing Payment, the $20,000 Closing Fee Payment, the $232,500 Cash Collateral Payments, the Monthly Accrued Balance Payments, and the $50,000 Payment, and monthly principal and interest payments required to be paid by Borrower under the Note, shall be made by wire transfer to Lender's account at as follows:

**WIRING INSTRUCTIONS:**

Cathay Bank
ABA No.: 1222-03950
Attn: Special Assets Department
GL #: 20210162-110

Loan No.: 238500160

Lender may change these instructions from time to time upon written notice to Borrower.

9.    *Property Taxes*.  (a)  Borrower hereby acknowledges and agrees that as of the date of this Agreement, the amount of all outstanding Property-related taxes (and related fees and charges for 2010 and prior years) due and owing to the applicable taxing authorities totals approximately $185,925.00 ("Delinquent Property Taxes").  Borrower hereby covenants and agrees to pay the Delinquent Property Taxes in four (4) monthly installments ("Delinquent Tax Payments") as follows:  (i) on or before September 1, 2011, Borrower shall pay the amount of $46,500.00 to the applicable taxing authorities; (ii) on or before October 1, 2011, Borrower shall pay an additional amount of $46,500.00 to the applicable taxing authorities; (iii) on or before November 1, 2011, Borrower shall pay an additional amount of $46,500.00 to the applicable taxing authorities; and (iv) on or before December 1, 2011, Borrower shall pay the remaining amount of all Delinquent Property Taxes then due and owing.  Borrower shall provide to Lender within ten (10) days after each Delinquent Tax Payment is due and owing a copy of the receipt from the applicable tax authorities showing the timely payment of the required Delinquent Tax Payments.  Borrower's failure to pay any such Delinquent Property Taxes and provide such evidence to Lender in accordance with the terms and conditions hereof shall be an event of default (subject to Lender first giving notice of such failure to Borrower and Borrower failing to cure such failure within ten (10) days) and Lender shall be entitled to exercise all of its remedies set forth in the Existing Loan Documents.

(b)    From and after the date hereof, Borrower shall pay any and all property taxes for 2011 and subsequent years in a timely manner and prior to delinquency thereof.  Borrower shall submit evidence satisfactory to Lender of such payment to Lender prior to the delinquency of any such property taxes.  Any suit instituted or remedy pursued by any applicable taxing authority as a result of Borrower's failure to pay any and all Delinquent Property Taxes or property taxes for subsequent years prior to delinquency of same shall constitute an Event of Default, and Lender shall be entitled to exercise all of its remedies set forth in the Loan Documents.  Borrower further covenants and agrees not to encumber the Property or at any time permit to exist any lien upon, against or covering the Property, including without limitation, any lien transferred in connection with any loan concerning the payment of property taxes and/or assessments.

10.    *Subordination of Management Agreement and Franchise Agreement Fees*.  (a) By their execution hereof, Shilo Management Corporation, an Oregon corporation ("Manager"), and Shilo Franchise International, an Oregon corporation ("Franchisor"), each agrees, acknowledges and consents as of the date hereof that any base, incentive or other fees, reimbursable expenses or other sums (with respect to the Management Agreement [hereinafter defined], "Management Fees", with respect to the Franchise Agreement [hereinafter defined], "Franchise Fees", and collectively, "Management and Franchise Fees") accruing, due, owing or payable to Manager, Franchisor or other related parties under that certain Management Agreement dated as of March 15, 2006, entered into between Borrower and Manager (the "Management Agreement") or the Franchise Agreement dated as of March 15, 2006, entered into between Borrower and Franchisor (the "Franchise Agreement") shall be (i) subordinate to the lien of the Deed of Trust and all right,

9

title and interest of Lender in and to the Property, or any portion thereof, and (ii) the Management and Franchise Fees shall be subject and subordinate to the prior payment, discharge and satisfaction in full of the obligations of Borrower, whether now existing or hereafter from time to time, accruing or arising, to repay the principal of, and to pay interest (including, without limitation, post-petition interest) on, the Loan and all other amounts whatsoever now or hereafter due or arising under the Loan Documents, subject to the terms hereof.

(b)      Manager and Franchisor each hereby agrees, acknowledges and consents as of the date hereof that all pre-petition fees and amounts ("Pre-Petition Management and Franchise Fees"), accruing, due, owing or payable to Manager, Franchisor or other related parties under the Management Agreement or the Franchise Agreement shall not be paid until the $100,000 Closing Payment and the $50,000 Payment have been paid in full to Lender. After such time as the $100,000 Closing Payment and the $50,000 Payment shall have been paid to Lender as required in this Agreement, then so long as no Event of Default under any of the Loan Documents shall have occurred and shall be continuing, and for so long as Borrower is current in making: (i) payments for operating expenses, taxes and payables relating to the Property (which shall not be less than the amount needed to operate the Property as set forth in the Projections, (ii) the required monthly payments of principal and interest to Lender as required herein; and (iii) the Monthly Accrued Balance Payments, in addition to any other amounts due on a Payment Due Date or any other date in accordance with the Original Note and the Loan Documents, Borrower may pay the Pre-Petition Management and Franchise Fees only after payment from Borrower to Lender of the amounts due and owing as set forth in (i), (ii) and (iii) above. Pre-Petition Management and Franchise Fees shall not be paid any time any event of default under any of the Loan Documents shall have occurred and shall be continuing.

(c)      All normal and reasonable monthly Management Fees (not exceeding four percent (4%) of total revenue) and Franchise Fees (not exceeding four percent (4%) of room revenues) incurred from and after the date of Closing may be paid monthly so long as no Event of Default under any of the Loan Documents shall have occurred and shall be continuing, and for so long as Borrower is current in making: (i) payments for operating expenses, taxes and payables relating to the Property (which shall not be less than the amount needed to operate the Property as set forth in the Projections, subject to a ten percent (10%) line item variance, (ii) the required monthly payments of principal and interest as required herein; and (iii) the Monthly Accrued Balance Payments, in addition to any other amounts due on a Payment Due Date or any other date in accordance with the Original Note and the Loan Documents. Such Management and Franchise Fees shall not be increased after the date hereof without the prior written consent of Lender.

(d)      Notwithstanding any provision of the Loan Documents to the contrary, as of December 1, 2010 and continuing at all times thereafter so long as the Loan remains unpaid, no fees, payments, equity distributions or loans (other than the subject Loan from Lender to Borrower) may be made by or on behalf of the Borrower to or for the benefit of Guarantor, any person or entity related or affiliated with Borrower or Guarantor including, without limitation, Franchisor, Manager, and any affiliate or entity controlled directly or indirectly by Guarantor, other than (i) Management and Franchise Fees permitted to be paid in accordance with the terms

hereof and (ii) "Excess Cash" which is permitted to be paid pursuant to the terms of Section 11 below. Borrower's manager or another officer of Borrower acceptable to Lender shall provide to Lender on a monthly basis, not later than the 30th day of the following month, a certification which provides that Borrower and Guarantor has complied with the terms of this paragraph. Any violation of the terms of this paragraph or failure to timely provide such certification shall constitute an Event of Default under the Loan Documents.

     11.    *Excess Cash Flow; Advances for Shortfalls.*    (a)  Excess Cash Flow. Notwithstanding any provision of the Loan Documents to the contrary, and subject to the terms hereof including, without limitation, satisfaction of the conditions precedent set forth below, Excess Cash (as defined below) from the Property may be paid and/or distributed annually (commencing with cash generated during calendar year 2012), as follows:

    (1)    sixty percent (60%) of the total Excess Cash for the applicable calendar year to be distributed to the members of Borrower; and

    (2)    forty percent (40%) of the total Excess Cash for the applicable calendar year to be paid to Lender for application towards the outstanding principal balance under Portion B of the Note (the parties acknowledging and agreeing that any such payment shall not reduce the amount(s) of any required monthly payments due under the Note).

    For purposes hereof, "Excess Cash" shall mean: (i) the net operating income derived from the Property as reasonably determined by Lender for the twelve (12) month period immediately preceding the calculation date (which shall occur at the end of each calendar year commencing with the end of calendar year 2012 for cash generated during calendar year 2012), less (ii) the amount of debt service required under the Loan for such period, less (iii) all property taxes and assessments actually paid or to be paid (or reserved and impounded for timely payment) on or before the January 31st deadline for such period, less (iv) all other operating expenses, taxes and payables of Borrower relating to the Property (which shall not be less than the amount needed to operate the Property as set forth in the Projections), and less (v) adequate cash reserves for operation of the Property in accordance with the Loan Documents and good practices (which shall not be less than the amount needed to operate the Property as set forth in the Projections). Lender reserves the right to review and/or dispute the calculation and determination of Excess Cash at any time using the Property's operating results, and notwithstanding the foregoing, in no event shall any Excess Cash be paid to members of Borrower if the operation of the Property will be impaired by a lack of cash, as reasonably determined by Lender.

    Payment and/or distribution of Excess Cash as set forth above shall be subject to the following conditions precedent:

    (i)    Lender's receipt of those certain five-year operating projections for the Property ("Projections") which include a new payment schedule to Lender, operating expenses, taxes, payables and cash reserve projections (Lender and Borrower hereby acknowledging and agreeing that this condition has been satisfied by the Projections previously delivered to Lender by Borrower's counsel on July 8, 2011);

AUS:0053676/00101:446530v9

(ii)    the $100,000 Closing Payment, the $20,000 Closing Fee Payment, and the $50,000 Payment shall have been paid to Lender in full;

(iii)    No default or event of default shall have occurred under the Loan Documents;

(iv)    No Excess Cash shall be payable and/or distributable earlier than for calendar year 2012 (for cash generated during calendar year 2012); and

(v)    Borrower shall have delivered to Lender at least ten (10) days prior written notice of any payment or distribution of Excess Cash.

(b)    <u>Advances for Shortfalls</u>.  Notwithstanding any provision of the Loan Documents to the contrary, in the event that Guarantor advances funds to the Borrower from time to time to cover any shortfalls in the operation of the Property, such funds or advances (1) shall be fully unsecured, (2) shall be expressly and fully subordinated to this Loan in all respects, and (3) may be repaid to Guarantor (without interest thereon) only in the event each of the following conditions have been met to the satisfaction of Lender:

(i)    Borrower and Guarantor shall have delivered to Lender written notice prior to Guarantor advancing any such funds;

(ii)    Borrower and Guarantor shall have delivered to Lender written notice at least five (5) days prior to any repayment of such funds to Guarantor; and

(iii)    No event shall have occurred and no condition shall exist which would constitute a default under the Loan Documents or this Agreement, either with or without notice or lapse of time, or both.

Notwithstanding the foregoing, without Lender's approval, Guarantor shall not be entitled to repayment of any of its prior advances in the event that such outstanding advances from Guarantor exceed the amount of $100,000 in the aggregate at any time during the term of the Loan.  In such event, Borrower and Guarantor shall be required to submit for Lender's approval a written request for repayment together with a detailed accounting of the shortfall(s), including a current budget and operating projections for the Property.

12.    *Texas Finance Code*.  In no event shall Chapter 346 of the Texas Finance Code (which regulates certain revolving loan accounts and revolving tri-party accounts) apply to the Note.  To the extent that Chapter 303 of the Texas Finance Code is applicable to the Note, the "weekly ceiling" specified in such article is the applicable ceiling; provided that, if any applicable law permits greater interest, the law permitting the greatest interest shall apply.

13.    *Usury*.  No provisions of this Agreement or the Loan Documents shall require the payment or permit the collection, application or receipt of interest in excess of the maximum permitted by applicable state or federal law.  If any excess of interest in such respect is herein or in

any such other instrument provided for, or shall be adjudicated to be so provided for herein or in any such instrument, the provisions of this paragraph shall govern, and neither Borrower nor any endorsers of the Note nor their respective successors, assigns or personal representatives shall be obligated to pay the amount of such interest to the extent it is in excess of the amount permitted by applicable law. It is expressly stipulated and agreed to be the intent of Borrower and Lender to at all times comply with the usury and other laws relating to the Loan Documents and any subsequent revisions, repeals or judicial interpretations thereof, to the extent applicable thereto. In the event Lender or other holder of the Note ever receives, collects or applies as interest any such excess, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance of Portion A and Portion B of the Note and, if upon such application the principal balance of Portion A and Portion B of the Note is paid in full, any remaining excess shall be forthwith paid to Borrower and the provisions of the Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of execution of any new document, so as to comply with the then applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder. In determining whether or not the interest paid or payable under any specific contingency exceeds the maximum interest allowed to be charged by applicable law, Borrower and Lender or other holder hereof shall, to the maximum extent permitted under applicable law, amortize, prorate, allocate and spread the total amount of interest throughout the entire term of the Note so that the amount or rate of interest charged for any and all periods of time during the term of the Note is to the greatest extent possible less than the maximum amount or rate of interest allowed to be charged by law during the relevant period of time. Notwithstanding any of the foregoing, if at any time applicable laws shall be changed so as to permit a higher rate or amount of interest to be charged than that permitted prior to such change, then unless prohibited by law, references in the Note to "applicable law" for purposes of determining the maximum interest or rate of interest that can be charged shall be deemed to refer to such applicable law as so amended to allow the greater amount or rate of interest.

14.    _Reaffirmation of Representations, Etc_. Borrower hereby reaffirms to Lender each of the representations, warranties, covenants and agreements of Borrower set forth in the Existing Loan Documents and Guarantor hereby reaffirms to Lender each of the representations, warranties, covenants and agreements of Guarantor set forth in the Existing Loan Documents.

15.    _Enforceable   Obligations_.    Borrower   hereby   ratifies,   affirms,   reaffirms, acknowledges, confirms and agrees that the Loan Documents represent valid and enforceable obligations of Borrower, and Borrower further acknowledges that there are no existing claims, defenses, personal or otherwise, or rights of setoff whatsoever with respect to the Note, and Borrower further acknowledges and represents that no event has occurred and no condition exists which would constitute a default under the Existing Loan Documents or this Agreement, either with or without notice or lapse of time, or both. Borrower acknowledges and agrees that all filings evidencing Lender's security interest in and to Borrower's personal property and fixtures including, without limitation, the UCC Financing Statement filed with the Secretary of State of Oregon under File No. 8671194, are sufficient to perfect Lender's liens and security interests in and to the Borrower's personal property and fixtures.

16.    *No Release of Liens*.  This Agreement in no way acts as a release or relinquishment of the liens, security interests and rights (the "Liens") created or evidenced by the Original Deed of Trust.  The Liens of the Original Deed of Trust are hereby ratified and confirmed by Borrower in all respects and are extended to secure (i) the principal amount of the Note, (ii) all interest, charges and other sums payable with respect thereto, (iii) the Remaining Balance of Interest and Costs, and (iv) the performance of all other obligations under the Original Deed of Trust as herein modified.

17.    **JURY TRIAL WAIVER.**    **TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, BORROWER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY THAT BORROWER OR LENDER MAY HAVE IN ANY ACTION OR PROCEEDING, IN LAW OR IN EQUITY, IN CONNECTION WITH THIS AGREEMENT OR THE DEBT. BORROWER REPRESENTS AND WARRANTS THAT NO REPRESENTATIVE OR AGENT OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WILL NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THIS RIGHT TO JURY TRIAL WAIVER. BORROWER ACKNOWLEDGES THAT LENDER HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE PROVISIONS OF THIS SECTION.**

18.    *Miscellaneous*. (a)    Capitalized terms not defined herein shall have the meanings as set forth in the Original Deed of Trust.

(b)    As modified hereby, the provisions of the Original Note and the Original Deed of Trust shall continue in full force and effect, and the Borrower acknowledges and reaffirms its liability to Lender thereunder.  In the event of any inconsistency between this Agreement and the terms of the Existing Loan Documents, this Agreement shall govern.

(c)    Borrower agrees that as of the date of this Agreement and in accordance with Section 7 hereof, Borrower has paid or caused to be paid all outstanding real property taxes for the year 2009.

(d)    Any default by Borrower in the performance of its obligations herein contained shall constitute a default under the Loan Documents and shall allow Lender to exercise all of its remedies set forth in the Loan Documents.  Borrower and Guarantor acknowledge and agree Borrower's obligations herein contained are valid and enforceable, and are not subject to objection, contest, avoidance, disallowance, offset, reduction or defenses.    Borrower and Guarantor further acknowledge and agree that (i) Borrower's obligation's hereunder are fully secured by the liens of the Deed of Trust and other Loan Documents, which liens are valid, enforceable and constitute first priority liens, security interests and rights in the Property described therein, and (ii) such Property is free and clear of liens, interests, claims and encumbrances other than the liens, interests, claims and encumbrances evidenced by the Loan Documents (and other than liens in favor of taxing authorities having jurisdiction over the Property which secure ad valorem taxes existing as of August 1, 2011).

(e)     Lender does not, by its execution of this Agreement, waive any rights it may have against any person not a party to this Agreement.

(f)     In case any of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

(g)     Borrower and Guarantor acknowledge and agree that notwithstanding any provision of the Loan Documents to the contrary, Borrower shall have no right or option to extend the term of the subject Loan or to otherwise further modify or restructure any terms of the Loan Documents.   Borrower acknowledges and agrees that any extension, modification or restructure of Borrower's outstanding indebtedness and obligations on or after the date hereof, or any agreement to forbear from exercising available rights and remedies after the date hereof, if any then are available to Lender, shall be at the sole and absolute discretion of Lender and must be approved by Lender's loan committee.

(h)     This Agreement and the Loan Documents shall be governed and construed according to the laws of the State of Texas (without regard to any conflict of laws principles) and the applicable laws of the United States.

(i)     This Agreement shall be binding upon and inure to the benefit of Lender, Borrower and their respective successors, assigns and legal representatives.

(j)     Borrower hereby acknowledges and agrees that it has entered into this Agreement of its own free will and accord and in accordance with its own judgment after advice of its own legal counsel, and states that it has not been induced to enter into this Agreement by any statement, act or representation of any kind or character on the part of the parties hereto, except as expressly set forth in this Agreement.

(k)     This Agreement may be executed in multiple counterparts, each of which shall constitute an original instrument, but all of which shall constitute one and the same agreement.

(l)     Except as modified herein, all other terms, conditions and provisions of the Existing Loan Documents shall remain in full force and effect as of the date thereof and Borrower acknowledges and reaffirms its liability to Lender thereunder.

## [SIGNATURES BEGIN ON THE FOLLOWING PAGE]

EXECUTED as of the day and year first above written.

**NOTICE PURSUANT TO TEX. BUS. & COMM. CODE §26.02**

**THIS AGREEMENT AND ALL OTHER DOCUMENTS EXECUTED BY ANY OF THE PARTIES PRIOR TO OR SUBSTANTIALLY CONTEMPORANEOUSLY WITH THE EXECUTION HEREOF, INCLUDING THE GUARANTY, TOGETHER CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**LENDER**:

CATHAY BANK,
a California banking corporation

By: _____
Name: _____
Title: _____

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California                                    }
County of _____                     }

On _____ before me, _____,
      Date                                     Here Insert Name and Title of the Officer
personally appeared _____,
                    Name(s) of Signer(s)

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____

    Place Notary Seal Above                     Signature of Notary Public

------------------------------------------   **OPTIONAL**   -------------------------------------------
*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _____
Document Date: _____ Number of Pages: _____
Signer(s) Other Than Named Above:_____

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name:_____ | Signer's Name:_____ |
| [ ] Individual | [ ] Individual |
| [ ] Corporate Officer – Title(s): _____ | [ ] Corporate Officer – Title(s): _____ |
| [ ] Partner -- [ ] Limited [ ] General | [ ] Partner -- [ ] Limited [ ] General |
| [ ] Attorney in Fact | [ ] Attorney in Fact |
| [ ] Trustee | [ ] Trustee |
| [ ] Guardian or Conservator | [ ] Guardian or Conservator |
| [ ] Other:_____ | [ ] Other:_____ |
| Signer is Representing:_____ | Signer is Representing:_____ |

RIGHT THUMBPRINT OF SIGNER

TOP OF THUMB HERE

RIGHT THUMBPRINT OF SIGNER

TOP OF THUMB HERE

AUS:0053676/00101:446530v9

**BORROWER**:

SHILO INN, KILLEEN, LLC,
an Oregon limited liability company

By: _Mark S. Hemstreet_
Name: _Mark S. Hemstreet_
Title: _Member_

THE STATE OF _Oregon_ §
§
COUNTY OF _Wallowa_ §

This instrument was acknowledged before me on the _23_ day of _July_, 2011, by _Mark S. Hemstreet_, _Member_ of Shilo Inn, Killeen, LLC, an Oregon limited liability company, on behalf of said limited liability company.

_Tami J. Phinney_
Notary Public in and for the State of ~~4-7-2013~~
_Oregon_

OFFICIAL SEAL
TAMI J PHINNEY
NOTARY PUBLIC-OREGON
COMMISSION NO. 436591
MY COMMISSION EXPIRES APRIL 7, 2013

18

**GUARANTOR**:

By: _~Mark S. Hemstreet~_ _____

Mark S. Hemstreet, an individual

THE STATE OF _Oregon_ §
                       §
COUNTY OF _Wallowa_   §

This instrument was acknowledged before me on the _23_ day of _July_ , 2011, by Mark S. Hemstreet, an individual.

_Tami J. Phinney_ _____

Notary Public in and for the State of _Oregon_

OFFICIAL SEAL
TAMI J PHINNEY
NOTARY PUBLIC-OREGON
COMMISSION NO. 436591
MY COMMISSION EXPIRES APRIL 7, 2013

AUS:0053676/00101:446530v9

**Acknowledged and agreed to for purposes of Section 8 of this Agreement:**

**MANAGER:**

SHILO MANAGEMENT CORPORATION,
an Oregon corporation

By: _Mark S. Hemstreet_
Name: _Mark S. Hemstreet_
Title: _President_

THE STATE OF _Oregon_   §
                                    §
COUNTY OF _Wallowa_   §

This instrument was acknowledged before me on the 23 day of _July_ , 2011, by
_Mark S. Hemstreet , President_              of Shilo Management Corporation, an
Oregon corporation, on behalf of said corporation.

OFFICIAL SEAL
TAMI J PHINNEY
NOTARY PUBLIC-OREGON
COMMISSION NO. 436591
MY COMMISSION EXPIRES APRIL 7, 2013

_Tami J. Phinney_
Notary Public in and for the State of ~~7 7~~ Oregon

**FRANCHISOR:**

SHILO FRANCHISE INTERNATIONAL,
an Oregon corporation

By: _Mark S. Hemstreet_
Name: _Mark S. Hemstreet_
Title: _President_

THE STATE OF _Oregon_   §
                                    §
COUNTY OF _Wallowa_   §

This instrument was acknowledged before me on the 23 day of _July_ , 2011, by
_Mark S. Hemstreet , President_              of Shilo Franchise International, an
Oregon corporation, on behalf of said corporation.

OFFICIAL SEAL
TAMI J PHINNEY
NOTARY PUBLIC-OREGON
COMMISSION NO. 436591
MY COMMISSION EXPIRES APRIL 7, 2013

_Tami J. Phinney_
Notary Public in and for the State of _4 7 2013_
_Oregon_

20

## SETTLEMENT AND LOAN REINSTATEMENT AGREEMENT

| STATE OF TEXAS | § |
| | § |
| COUNTY OF BELL | § |

**THIS SETTLEMENT AND LOAN REINSTATEMENT AGREEMENT** ("**Agreement**") is dated, made, executed and entered into effective as of August 1, 2011, by **CATHAY BANK**, a California banking corporation ("**Lender**"), the owner and holder of the Note (as hereinafter defined), **SHILO INN, KILLEEN, LLC**, an Oregon limited liability company ("**Borrower**"), and **MARK S. HEMSTREET**, in individual ("**Guarantor**").

### RECITALS:

A.      Lender made a loan (the "**Original Loan**") to Borrower evidenced by that certain Term Note (the "**Original Note**") dated December 11, 2007 (the "**Original Closing Date**"), in the original principal amount of $15,500,000.00, payable to the order of Lender, as modified by that certain Modification Agreement (the "**Modification Agreement**") dated as of the date hereof entered into by and between Borrower, Lender and Guarantor (the Modification Agreement, together with the Original Note, hereinafter referred to as the "**Note**"; the Original Loan, as modified by the Modification Agreement, hereinafter referred to as the "**Loan**"). The Note is secured by, among other security, that certain Deed of Trust, Absolute Assignment of Rents, Security Agreement and Financing Statement, dated as of the Original Closing Date, executed by Borrower to Anthony M. Tang, as Trustee, for the benefit of Lender, recorded under Instrument No. 2007-00053214 of the Real Property Records of Bell County, Texas (the "**Original Mortgage**") and the Modification Agreement (the Original Mortgage, together with the Modification Agreement, hereinafter referred to as the "**Mortgage**"), encumbering the property more particularly described on Exhibit "A" attached hereto and incorporated herein (the "**Mortgaged Property**"). The Note was issued pursuant to that certain Letter Loan Agreement dated as of the Original Closing Date (the "**Original Loan Agreement**") by and among Borrower, Lender and Guarantor (the Original Loan Agreement, together with the Note, hereinafter referred to as the "**Loan Agreement**").

B.      The Loan is guaranteed by that certain Guaranty Agreement ("**Guaranty**") dated December 11, 2007, executed by Guarantor for the benefit of Lender. The Note, Mortgage, Guaranty, Modification Agreement, Loan Agreement and any other documents or instruments evidencing, governing or securing the Loan are hereinafter collectively referred to as the "**Loan Documents**." The Mortgaged Property and all rights, interests and other items encumbered by and/or described in the Loan Documents and all hereditaments and appurtenances thereto are hereinafter collectively referred to as the "**Property**." The indebtedness evidenced by the Note, including, but not limited to, principal, accrued interest, and attorneys' fees and expenses, together with all indebtedness described in and secured by the Loan Documents is hereinafter referred to as the "**Indebtedness**."

AUS:0053676/00101:446551v14

C.     Lender is the present owner and holder of the Note and is the beneficiary of the Loan Documents.  By instrument dated July 7, 2010, styled Removal of Trustee and Appointment of Substitute Trustee, Lender removed Anthony M. Tang and any Trustee or successor or Substitute Trustee appointed by unrecorded document or otherwise as Trustee under the Original Mortgage, and appointed Tai C. Tran as the Substitute Trustee thereunder in accordance with such instrument.

D.     Borrower defaulted in the payment required under the Loan Documents and in the performance of certain obligations under the Loan Documents.  As set forth in a letter to Borrower dated July 12, 2010, the Original Note was accelerated by Lender and the unpaid principal balance of the Original Note declared immediately due and payable by Lender (collectively, with any other acceleration of the maturity date of the Original Note and the unpaid principal balance thereof prior to August 1, 2011, the "**Prior Acceleration**").

E.     On December 6, 2011 ("**Petition Date**"), the Borrower filed a voluntary petition commencing a bankruptcy case under chapter 11 of the United States Bankruptcy Code, Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Central District of California ("**Bankruptcy Court**").  The Borrower's bankruptcy case is assigned case no. 2:10-bk-62057-VZ ("**Killeen Bankruptcy Case**") and is jointly administered with bankruptcy case no. 2:10-bk-60884-VZ (the "**Diamond Bar Bankruptcy Case**") of debtor Shilo Inn, Diamond Bar, LLC ("**Diamond Bar**").  Borrower is a debtor in possession in the Killeen Bankruptcy Case.

F.     Borrower, Lender and Guarantor have agreed to settle issues and disputes concerning the payment of Lender's claim, certain allegations made by Borrower and other matters related to the Killeen Bankruptcy Case and reinstate the Original Loan, as modified by the Modification Agreement (all of the terms and conditions of which are hereby incorporated herewith for all purposes), pursuant to the terms and conditions set forth herein.

## *AGREEMENT:*

**NOW, THEREFORE**, for and in consideration of the following terms, conditions, covenants, warranties and representations and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and expressed, it is agreed as follows:

1.     **Court Approval; Cash collateral**.

(a)     This Agreement, the Modification Agreement, and the rights, duties, undertakings and obligations under this Agreement and the Modification Agreement, are subject to satisfaction of the following conditions precedent (the "**Approval Order Conditions**"): (i) the approval of this Agreement and the Modification Agreement by the Bankruptcy Court in the Killeen Bankruptcy Case through entry of an order of the Bankruptcy Court ("**Approval Order**") by no later than August 29, 2011, and (ii) the Approval Order becomes a Final Order (defined below) by no later than September 23, 2011; provided however, that Lender may waive the requirement of a Final Order and either of the foregoing deadlines in its sole discretion.  If

AUS:0053676/00101:446551v14

the Approval Order Conditions are not timely satisfied or waived, then Lender is not obligated to enter into this Agreement.

(b)     This Agreement, the Modification Agreement and the rights, duties, undertakings and obligations under this Agreement and the Modification Agreement, are also subject to and are not effective until each of the "Conditions to Closing" (defined below) are satisfied or are waived by Lender.

(c)     By no later than August 1, 2011, Borrower shall file a motion ("**Settlement Motion**") with the Bankruptcy Court in the Killeen Bankruptcy Case requesting approval of this Agreement and the transactions contemplated herein (the "**Settlement**"), including, without limitation, under Sections 105 and 363(b) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**").     The form and substance of the Settlement Motion shall be subject to Lender's prior written approval and shall be served on all creditors, all parties asserting liens or security interests in any of the Property, and all parties in interest.  Borrower shall, with diligence and in good faith, prosecute the Settlement Motion to obtain the Approval Order and shall defend the Agreement and Settlement against any appeal or motion to vacate, reverse, modify or overturn the Approval Order. The notice of the Settlement Motion and the Approval Order shall be in form acceptable to Lender.   The Approval Order shall be in form and substance acceptable to Lender, and shall include a finding that Lender is acting in good faith.   The Borrower shall request, as part of the Settlement Motion to be incorporated into the Approval Order, an order dismissing the Killeen Bankruptcy Case effective ten (10) days after the "**Closing**" (defined below) of this Agreement and the Modification Agreement, with such dismissal and the Approval Order expressly subject to and preserving (and not impairing, setting aside, avoiding or affecting), this Agreement, the Modification Agreement, the Closing, the Loan Documents, the transactions consummated pursuant to this Agreement and the Modification Agreement, and the liens, claims, rights and remedies of Lender under state law and the Loan Documents, under this Agreement and the Modification Agreement, or under other orders of the Bankruptcy Court.

(d)     "**Final Order**" for purposes of this Agreement means an order or judgment, the operation or effect of which has not been stayed, reversed or amended, and, as to which order the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for re-argument or rehearing, shall then be pending, or as to which any right to appeal, petition for certiorari, re-argument or rehearing shall have been waived in writing by all persons or entities possessing such right, or, in the event that an appeal, writ of certiorari, or re-argument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or from which re-argument or rehearing was sought, or certiorari has been denied, and the time to take any further appeal, petition for certiorari, or move for re-argument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a Final Order.

(e)     In accordance with the terms and conditions of the Orders entered in the Killeen Bankruptcy Case concerning Borrowers' use of cash collateral ("**Cash Collateral Orders**"),

Borrower shall continue to pay to Lender every month the required adequate protection payments through and including the month of August, 2011).

    2.    **<u>Closing</u>**:

(a) The closing ("**<u>Closing</u>**") of the payments and deliveries contemplated by this Agreement and the Modification Agreement to occur upon Closing shall occur within three (3) business days after the satisfaction (or waiver by Lender) of each of the Conditions to Closing. The Closing shall take place in the offices of Lender's counsel, Locke Lord Bissell & Liddell, LLP, as may be agreed by the Lender and Borrower.

(b) The "**<u>Conditions to Closing</u>**" are: (i) satisfaction of each of the Approval Order Conditions (or waiver thereof by Lender), (ii) satisfaction of each of the conditions to the effectiveness of the Modification Agreement as set forth in Section 2(a) thereof; and (iii) Lender's approval of Borrower's five-year operating projections for the Property which include a new payment schedule to Lender, operating expenses, taxes, payables and cash reserve projections, which projections were submitted to Lender by David Golubchik, Esq. on behalf of Borrower on July 8, 2011 and are acceptable to Lender for purposes of satisfying this condition 2(b)(iii).

    3.    **<u>Allowance of Claim</u>**: Lender's claim under the Loan is allowed in the aggregate sum of each of the amounts set forth below (as so allowed, the "**<u>Lender's Allowed Claim</u>**") :

(a)    $14,902,868.33 representing unpaid principal balance under the Loan as of August 1, 2011;

(b)    $652,599.16 representing accrued, unpaid pre-petition interest (accrued prior to the Petition Date) under the Loan;

(c)    $101,840.94 representing Lender's pre-petition (accrued prior to the Petition Date) costs, expenses and legal expense; and

(d)    $94,667.50 representing pre-petition late charges (accrued prior to the Petition Date);

(e)    $580,309.42 representing post-petition interest (accrued after the Petition Date) through July 31, 2011 on the unpaid principal balance of the Note at the non-default contract rate;

(f)    $233,159.06 representing Lender's post-petition legal expenses and costs, including costs of consultants, as of May 31, 2011;

(g)    $20,000.00 representing fees and costs incurred by Lender after May 31, 2011 and through the date of this Agreement in connection with negotiating this Agreement and the Modification Agreement and obtaining approval of this Agreement in the Killeen Bankruptcy Case as provided herein and incurred in connection with the existing lawsuit filed by Lender against Guarantor, styled *Cathay Bank v. Mark Hemstreet*, initially filed as Cause No. 2011-07146 in the 333rd Judicial District Court, Harris County, Texas, and, after removal by

AUS:0053676/00101:446551v14

Guarantor, now pending as Civil Action No. 4:11-cv-1666 in the United States District Court, Southern District of Texas, Houston Division (the "**Guarantor Lawsuit**").

Borrower and Guarantor acknowledge and agree that the Lender's Allowed Claim is allowed for all purposes as a fully secured claim, is valid and enforceable, and is not subject to objection, contest, avoidance, disallowance, offset, reduction or defenses. Borrower and Guarantor further acknowledge and agree that (i) Lender's Allowed Claim is fully secured by the liens of the Mortgage and other Loan Documents, which liens are valid, enforceable and constitute first priority liens, security interests and rights in the Mortgaged Property described therein, and (ii) the Mortgaged Property is free and clear of liens, claims, interests and encumbrances other than such liens, claims, interests and encumbrances evidenced or created by the Loan Documents. Borrower and Guarantor hereby release and waive any objection, dispute or contest they have concerning the allowance, enforceability, or validity of the Lender's Allowed Claim and the Loan Documents.

    4.    **Payment of Claim**. Borrower promises and agrees to pay Lender's Allowed Claim and the Note, and all accrued unpaid interest thereon, as follows:

    (a)    the unpaid principal balance of the Note, plus interest accruing after the date of this Agreement, shall be allocated into the following two components for purposes of the applicable interest rate and the terms of repayment: (i) the first component is referred to as "Portion A" and shall be comprised of the outstanding principal balance of $8,125,000.00) and (ii) the second component is referred to as "Portion B" and shall be comprised of the outstanding principal balance of $6,777,868.33. The unpaid principal balance of the Note (including both Portion A and Portion B) shall be paid as set forth in the Modification Agreement, the terms and conditions of which are hereby incorporated herewith for all purposes; and

    (b)    the allowed accrued and unpaid interest and late charges and Lender's costs and expenses (including legal and consulting fees) incurred through the date of this Agreement of $1,682,576.08 (the "**Aggregate Balance of Interests and Costs**"), which amounts are identified and allowed in section 3(b)-(g) of this Agreement, shall be paid as follows (which payment terms and provisions are as further described and set forth in further detail in the Modification Agreement):

    (i)    First, at Closing, Borrower shall pay to Lender (the "**Closing Payments**"):

    (1)    the $100,000 Closing Payment (as defined in the Modification Agreement), to be applied towards accrued and unpaid interest due and owing under the Loan as of August 1, 2011;

    (2)    the $20,000 Closing Fee Payment (as defined in the Modification Agreement),

    (3)    to the extent not already paid, the $232,500 Cash Collateral Payments (as defined in the Modification Agreement), to be applied towards accrued and unpaid post-petition interest due and owing as of August 1, 2011;

(ii)    Second, the "Remaining Balance of Interest and Costs" (as defined in the Modification Agreement) of $1,330,076.08 (which represents the remaining unpaid balance of the Aggregate Balance of Interests and Costs after the payments identified in (b)(i) above), shall be paid after Closing in installments as set forth in the Modification Agreement.

(c) Additional amounts shall be due and payable by Borrower pursuant to the terms of the Modification Agreement including, without limitation, the "Modification Fee" and the prepayment premium as set forth in Section 5(b) of the Modification Agreement, subject to the terms and conditions set forth in the Modification Agreement.

5.    **Principal Balance**.  Borrower and Lender confirm that after application of the Closing Payments, the outstanding principal balance of the Note upon and after Closing is $14,902,868.33.  For purposes of payment, interest and other terms agreed upon by Lender and Borrower as set forth herein and in the Modification Agreement, such outstanding principal balance shall be separated into two components or portions, as follows: (i) Portion A (as defined in the Modification Agreement) of the Note, which as of August 1, 2011, shall reflect an outstanding principal balance of $8,125,000; and (ii) Portion B (as defined in the Modification Agreement) of the Note, which as of August 1, 2011, shall reflect an outstanding principal balance of $6,777,868.33.  Borrower and Lender confirm that after application of the Closing Payments, the Remaining Balance of Interest and Costs upon and after Closing is $1,330,076.08.

6.    **Reinstatement of Loan**.  Provided that all Conditions to Closing have been satisfied and Borrower shall have remitted to Lender all amounts required to be paid at Closing in accordance with the terms and conditions of the Modification Agreement, the Original Note and the Original Mortgage and all instruments executed in connection therewith, as of the date hereof, are fully reinstated, as modified by the Modification Agreement, in accordance with their terms and conditions as if: (i) no default or event of default had occurred under the Original Note prior to the date of this Agreement, and (ii) no acceleration or Prior Acceleration of the unpaid principal balance of the Original Note had occurred prior to the date of this Agreement; provided however, that the reinstatement is without prejudice to and shall not affect the rights and obligations of the parties expressly provided for herein or the Modification Agreement including, without limitation, Borrower's obligation to pay the Aggregate Balance of Fees and Costs. Subject to the terms of this Agreement, upon and after the date hereof, the unpaid principal balance of the Note, accrued unpaid interest thereon, and any other Indebtedness due and owing or that becomes due and owing shall be due and payable under the terms of the Loan Documents, as modified by the Modification Agreement, as if the Prior Acceleration had not occurred.  It is expressly understood that Lender will and does hereafter require full performance of any and all terms, conditions or requirements of all the Loan Documents, including the Modification Agreement.  It is further understood that the validity, priority or perfection of the Mortgage is not diminished in any way by this Agreement.

7.    **Strict Performance**.  Borrower agrees to perform, strictly in accordance with all their terms and conditions, the Note, the Mortgage and all Loan Documents.  Borrower further acknowledges and agrees that (a) any performance or nonperformance of the Original Note and/or the Original Mortgage prior to the date of this Agreement does not affect or diminish in any way the requirement of strict compliance with the Note and Mortgage; (b) the Mortgage is a first and superior lien on the Property; and (c) Borrower neither has nor shall claim any offsets,

defenses, counterclaims, claims or causes of action with respect to Lender in connection with (i) the Note, (ii) the Mortgage, (iii) the Indebtedness, (iv) the Property, and/or (v) any other documents executed in connection therewith. Lender is authorized to exercise all of its rights and remedies under the Loan Documents (as modified by this Agreement and the Modification Agreement) upon any default occurring on or after August 1, 2011.

8.    **Borrower Ratification**. Borrower hereby ratifies, confirms and agrees (a) that each of the recitals set forth herein is true and correct, (b) the Note, the Mortgage and the other Loan Documents are in full force and effect, (c) that Borrower has no claims, counterclaims offsets or defenses to the Note, the Mortgage or the other Loan Documents of the obligations and agreements of Borrower thereunder, and (d) this Agreement in no way acts as a release or relinquishment of the liens, security interests and rights (the "<u>Liens</u>") created or evidenced by the Mortgage, which Liens are hereby ratified and confirmed by Borrower in all respects and are confirmed to secure (i) the principal amount of the Note, (ii) all interest, charges and other sums payable with respect thereto, (iii) the Remaining Balance of Interest and Costs, and (iv) the performance of all other obligations under the Mortgage.

9.    **<u>Guarantor Ratification</u>**.

(a)    Guarantor consents to the Agreement and Modification Agreement and all transactions contemplated thereby. Guarantor expressly affirms the Guaranty and acknowledges and agrees that the Indebtedness remains outstanding and that Guarantor continues to be fully bound by all of the terms and conditions of the Guaranty as set forth herein and therein, notwithstanding this Agreement and the Modification Agreement. The Guaranty is and shall continue to be in full force and effect, as (and to the extent) ratified, confirmed and reinstated hereby. Nothing contained in this Agreement or the Modification shall be deemed to be or effect (a) a novation of the Indebtedness, (b) any waiver or release of any of the terms and conditions of the Guaranty or the Loan Documents or of any existing or future defaults or events of default thereunder, (c) an extension of time for the payment or performance of any obligation to be performed on the part of Borrower or Guarantor or any other obligor thereunder, (d) any waiver or release of Lender's rights to exercise any and all remedies with respect thereto, or the effectiveness of any notices of intention to accelerate, notices of acceleration, or acceleration given prior or subsequent to the execution and recording of this Agreement, or (e) the original terms, conditions and provisions of the Guaranty, including without limitation, maximum exposure to Mark S. Hemstreet under such Guaranty, which the parties acknowledge is as set forth in Article VII of the Original Loan Agreement except that Lender and Borrower both agree that (i) all requirements and prerequisites for the execution of an amended Guaranty substituting the meaning of the term "Debt" in the original Guaranty for the meaning of "Debt" set forth in Article VII of the Original Loan Agreement have been satisfied; and (ii) no rights or obligations shall be waived by Borrower's and Lender's failure to execute an amended Guaranty substituting the meaning of the term "Debt" in the Guaranty for the meaning of "Debt" set forth in Article VII of the Original Loan Agreement. Without limiting the generality of the foregoing, Guarantor acknowledges and agrees that the Indebtedness is, and remains, owing and payable, subject to the terms of this Agreement and the Modification Agreement and, as of August 1, 2011, has not been paid in full.

-7-

(b)     Within ten (10) days after the date of Closing, Lender shall dismiss the Guarantor Lawsuit without prejudice.

10.    **Further Cooperation**.  Borrower, Guarantor and Lender each hereby agree to execute, acknowledge and deliver, or cause to be executed acknowledged and delivered, such documents and instruments, and take all such actions, as Lender or its respective successors and assigns reasonably may request from time to time to confirm the rights created or now or hereafter intended to be created under the Loan Documents, to protect and further the validity, priority and enforceability of the Loan Documents, or otherwise to carry out the purposes of this Agreement, the Loan Documents, and the transactions contemplated hereunder and thereunder, including, without limitation, any such documents, instruments and actions as may be deemed necessary or advisable by any title insurance agent or underwriter.  Borrower and Guarantor acknowledge and agree that all filings evidencing Lender's security interest in and to Borrower's personal property and fixtures including, without limitation, the UCC Financing Statement filed with the Secretary of State of Oregon under File No. 8671194, are sufficient to perfect Lender's liens and security interests in and to the Borrower's personal property and fixtures.

11.    **Release; Waiver of Claims and Indemnity**.  **Borrower and Guarantor ("Obligors") each for themselves and the Borrower's bankruptcy estate, and to the extent allowed by law, on behalf of their respective partners, subsidiaries, divisions, participants, affiliated corporations, trustees, advisors, beneficiaries, officers, directors, agents, managers, employees, servants, attorneys and representatives, as well as their respective heirs, executors, legal representatives, administrators, successors and assigns (with the Obligors, collectively the "Obligors' Releasing Parties"), hereby jointly and severally release, acquit and forever discharge Lender and its advisors, officers, directors, agents, employees, servants, attorneys and representatives, as well as their respective heirs, executors, legal representatives, administrators, successors and assigns (collectively, the "Lender's Related Parties") from any and all claims, demands, damages, debts, costs, expenses, liabilities, contracts, agreements, obligations, accounts, defenses, suits, actions, causes of action or claims for relief of any kind or character whatsoever, known or unknown, suspected or unsuspected, in contract or in tort, at law or in equity, whether heretofore or hereafter accruing, which any of the Obligors' Releasing Parties, jointly or severally, ever had or now have or may have in the future against Lender or any of the Lender's Related Parties, jointly or severally, at any time prior to and from and after the date hereof, for or by reason of any matter, cause, or thing done, admitted to, or suffered to be done by Borrower or Lender or any of the Lender's Related Parties, jointly or severally, at any time prior to and including the date hereof and:**

(A)    **in any way connected with, arising out of, or related to or in furtherance of**

     (i)     **the loan evidenced by the Loan Documents,**

     (ii)    **any of the Loan Documents and any modifications or amendments thereto,**

     (iii)   **any of the transactions arising out of, related to or contemplated by any of the Loan Documents,**

(iv)    Lender's attempts to foreclose its Original Mortgage and the Prior Acceleration,

(v)    Lender's notification of any negative credit reporting to any credit agency,

(vi)    the closing of the Original Loan and the administration of the Original Loan,

(vii)    any objections or complaints about the Original Note and Original Mortgage,

(vii)    any act, transaction or occurrence prior to the date hereof,

(viii)    the allowance of Lender's Allowed Claim,

(ix)    Lender's security interests and liens securing the indebtedness evidenced by the Loan Documents,

(x)    any or all agreements, covenants and obligations (the "Lender's Obligations") of Lender or the Lender's Related Parties relating to the loan evidenced by the Loan Documents or any of the Loan Documents,

(xi)    any or all prior understandings or agreements, oral or written, and negotiations related thereto with respect to the agreements herein or foreclosures and conveyances contemplated in the Loan Documents,

(xii)    the exercise, enforcement or realization upon any rights, remedies, powers or entitlements of Lender under or relating to any of the Loan Documents (the "Lender's Remedies"), or

(xiii)    the advancing of any funds and administration of the Loan Documents by Lender to or for the benefit or account of the Obligors or any other person or entity with respect to any of the Loan Documents, and

**(B)**    in any way connected with, arising out of, or related to any avoidance rights or powers (or rights or powers to recover a transfer, the value of transfer or a lien) arising under the Bankruptcy Code (including without limitation, Chapter 5 of the Bankruptcy Code) or under applicable state law governing the avoidance and recovery of transfers, liens, claims, payments or obligations, including any claim or power to avoid a security interest or lien asserted by Lender in any property of Borrower.

The foregoing release shall include, without limitation, to the extent allowed by applicable law such claims or defenses as fraud, mistake, duress, overreaching, usury, failure to disclose, and interference with business management or relationships relating to any of the matters, documents, transactions, acts or omissions described above. For purposes hereof, all claims released hereunder by the Obligors and the Obligors' Releasing Parties are collectively called the "Obligors' Claims." Notwithstanding anything herein to the contrary, the release in this section is intended to be and shall be construed as a release of the Obligors' Claims by the Obligors' Releasing Parties of all persons who are, were, or have been, officers, directors, attorneys, shareholders, partners, joint venturers, agents,

-9-

representatives, employees, or trustees of the person or entity released, whether or not specifically named herein, together with any and all other persons, whether natural, corporate or otherwise, in privity with any of them, including all of their respective heirs, executors, legal representatives, administrators, successors and assigns, whether or not specifically named herein.   To the maximum extent permitted by applicable law, each undersigned Obligor under the Loan Documents hereby WAIVES all rights, remedies, claims and defenses based upon or related to Sections 51.003, 51.004 and 51.005 of the Texas Property Code, to the extent the same pertain or may pertain to any enforcement of any of the Loan Documents.

Each Obligor warrants and represents that such Obligor is the sole and lawful owner of all right, title and interest in and to all of the claims released hereby and such Obligor has not heretofore voluntarily, by operation of law or otherwise, assigned or transferred or purported to assign or transfer to any person any such claim or any portion thereof. Obligors shall indemnify and hold harmless Lender and Lender's Related Parties from and against any claim, demand, damage, debt, liability (including payment of attorneys' fees and costs actually incurred whether or not litigation is commenced) based on or arising out of any assignment or transfer. The provisions of this section shall survive the payment in full of the obligations owing by Obligors to Lender, the full performance of all the terms of this Agreement, the Original Loan Agreement and all other Loan Documents, and/or the Lender's actions to exercise any remedy available under this Agreement, the Original Loan Agreement, any other Loan Documents or otherwise.

As further consideration for such release, Borrower and Guarantor hereby agree, represent, and warrant that the matters released herein are not limited to matters that are known or disclosed, and Borrower and Guarantor hereby waive any and all rights and benefits that either now has, or in the future may have, conferred upon it by virtue of the provisions of Section 1542 of the Civil Code of the State of California, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

In this connection, Borrower and Guarantor hereby agree, represent, and warrant that they realize and acknowledge that factual matters now unknown to them may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses, and expenses that are presently unknown, unanticipated, and unsuspected, and they further agree, represent, and warrant that the release has been negotiated and agreed upon in light of that realization, and that they nevertheless hereby intend to release, discharge, and acquit the parties set forth hereinabove from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses, and expenses that are in any way related to the Obligors' Claims.

AUS:0053676/00101:446551v14

12. **No Impact on Other Loans**: This Settlement, the Agreement, the Modification Agreement and the transactions contemplated thereby do not affect or apply to Diamond Bar, the Diamond Bar Bankruptcy Case, Lender's loan to Diamond Bar, the loan documents evidencing Lender's loan to Diamond Bar, the rights, claims and interests between Lender and Diamond Bar, the guaranty agreements executed by Mark S. Hemstreet in favor of Lender related to Lender's loan to Diamond Bar and the existing lawsuit against Mark Hemstreet by Lender based upon his guaranty agreement related to Lender's loan to Diamond Bar (which lawsuit is styled *Cathay Bank v. Mark S. Hemstreet*, filed as Case No. KC 060510 in the Superior Court of California, County of Los Angeles). It is further understood and agreed that: (i) Borrower and Guarantor reserve all rights and remedies against Lender, and its legal counsel, arising out of the Diamond Bar Loan and (ii) Lender reserves all rights and remedies against Borrower and Guarantor, and their respective legal counsel, arising out of the Diamond Bar Loan.

13. **No Admission**. The purpose of this Agreement is to settle and resolve issues related to the Killeen Bankruptcy Case and the Loan and to release claims as provided herein, and the parties hereto understand and agree that this Agreement is being made to avoid the uncertainty, time, trouble, and expense of litigation. Accordingly, nothing in this Agreement is an admission by Lender of merit or liability regarding any claims released herein against the Lender's Related Parties, but rather, such liability has been and is expressly denied.

14. **Ownership; No Transfer.** Borrower and Guarantor warrant and represent to the Lender that: (i) Borrower is the current owner and holder of all claims belonging to Borrower and its bankruptcy estate against Lender, and (ii) Borrower has not transferred to any other entity or person any alleged interest in any such claims.

15. **Review and Construction of Documents.** By execution of this Agreement, Borrower and Guarantor represent and warrant to Lender that: (i) they read this Agreement and understand all of the terms and conditions hereof; (ii) they executed this Agreement voluntarily with full knowledge of the significance of this Agreement and execution hereof; (iii) they are represented by their own legal counsel and have been advised by such counsel concerning this Agreement; and (iv) this Agreement shall be construed as if jointly drafted by Borrower, Guarantor and Lender. By execution of this Agreement, Lender represents and warrants to Borrower that: (i) Lender has read this Agreement and understands all of the terms and conditions hereof; (ii) Lender executed this Agreement voluntarily with full knowledge of the significance of this Agreement and execution hereof; (iii) Lender is represented by its own legal counsel and has been advised by such counsel concerning this Agreement; and (iv) this Agreement shall be construed as if jointly drafted by Borrower, Guarantor and Lender.

16. **Authority.** Borrower represents and warrants to Lender that: (i) the execution, delivery and performance of this Agreement and the Modification Agreement by Borrower has been duly authorized by all necessary corporate or other organization action; (ii) no other approvals, consents or authorizations are required or necessary for Borrower to enter into and execute this Agreement or the Modification Agreement; and (iii) this Agreement and the Modification Agreement represent the legal, valid and binding obligation of Borrower, enforceable in accordance with the terms thereof. Each person who executes this Agreement and/or the Modification Agreement on behalf of Borrower represents and warrants to Lender that his/ her signature represents the valid and binding action of Borrower and that he/ she has been

AUS:0053676/00101:446551v14

duly authorized, empowered and directed to execute and deliver to the Lender, for and on behalf of Borrower, this Agreement and/or the Modification Agreement, as applicable. Guarantor represents and warrants that he has the full power and authority to execute this Agreement and bind the Guaranty hereto. Lender represents and warrants to Borrower and Guarantor that: (i) the execution, delivery and performance of this Agreement and the Modification Agreement by Lender has been duly authorized by all necessary corporate or other organization action; (ii) no other approvals, consents or authorizations are required or necessary for Lender to enter into and execute this Agreement or the Modification Agreement; and (iii) this Agreement and the Modification Agreement represent the legal, valid and binding obligation of Lender, enforceable in accordance with the terms thereof. Each person who executes this Agreement and/or the Modification Agreement on behalf of Lender represents and warrants to Borrower and Guarantor that his/ her signature represents the valid and binding action of Lender and that he/ she has been duly authorized, empowered and directed to execute and deliver to the Borrower, for and on behalf of Lender, this Agreement and/or the Modification Agreement, as applicable.

17.    **No Other Promises or Inducements.**  Borrower and Guarantor represent and warrant to Lender that: (i) no promise, representation, inducement or other consideration, other than as described in this Agreement, have been offered to or accepted by Borrower or Guarantor in exchange for this Agreement; and (ii) this Agreement is executed without reliance by Borrower and Guarantor upon any oral statements or oral representations by either Lender or any of its representatives.   Lender represents and warrants to Borrower and Guarantor that: (i) no promise, representation, inducement or other consideration, other than as described in this Agreement, have been offered to or accepted by Lender in exchange for this Agreement; and (ii) this Agreement is executed without reliance by Lender upon any oral statements or oral representations by either Borrower or Guarantor or any of its representatives.

18.    **Entire Agreement.**  This Agreement, the Modification Agreement and the Loan Documents embody the final, entire agreement between the parties hereto regarding the settlement set forth in this Agreement and supersedes any and all prior oral commitments, oral agreements and oral representations and understandings relating to the settlement set forth in this Agreement. There are no oral agreements among the parties hereto related to the subject matter hereof.    This Agreement may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto.    The parties hereto agree to execute such other and further documents and/or pleadings as may be reasonably necessary to evidence or carry out the terms and provisions of this Agreement. The Recitals are incorporated into and are a part of this Agreement.

19.    **Counterparts.**  This Agreement may by executed and delivered in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute one instrument and agreement. A copy of an executed counterpart delivered by electronic means or telecopy shall bind the party executing and so delivering that counterpart.

20.    **Amendments.**  The provisions of this Agreement may be amended or waived only by an instrument in writing signed by all signatory parties hereto.

-12-

21.    **Severability.**  In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or non-enforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

22.    **Headings.**  The headings of the sections of this Agreement are inserted as a matter of convenience and for reference only and in no way define, limit or describe the scope of this Agreement or the meaning of any provision of this Agreement.

23.    **Governing Law.**  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

24.    **Successors and Assigns.**  This Agreement shall be binding upon Lender, Borrower and Guarantor and their respective heirs, legal representatives, successors and assigns. This Agreement may be relied upon by, and any benefits which arise hereunder shall inure to, Lender, and its respective successors and assigns.  This Agreement is not a consent by Lender to any transfer, assignment or conveyance by Borrower of the Mortgaged Property.

[Signature(s) and Acknowledgment(s) on Following Page(s)]

AUS:0053676/00101:446551v14

**EXECUTED** this _____ day of August, 2011.

**LENDER**:

CATHAY BANK, a
California banking corporation

By: _____
Name: _____
Title: _____

**BORROWER**:

SHILO INN, KILLEEN, LLC, an
Oregon limited liability company

By: _Mark S. Hemstreet_
Name: _Mark S. Hemstreet_
Title: _Member_

**GUARANTOR**:

_Mark S. Hemstreet_
MARK S. HEMSTREET

AUS:0053676/00101:446551v14

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**

State of California }
County of _____ }

On _____ before me, _____
     Date
personally appeared    Here Insert Name and Title of the Officer

personally appeared _____
                                     Name(s) of Signer(s)

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____
              Signature of Notary Public

Place Notary Seal Above

------------------------------------- *OPTIONAL* -------------------------------------
*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: _____
Document Date: _____ Number of Pages: _____
Signer(s) Other Than Named Above:_____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name:_____ | Signer's Name:_____ |
|---|---|
| [ ] Individual | [ ] Individual |
| [ ] Corporate Officer – Title(s): _____ | [ ] Corporate Officer – Title(s): _____ |
| [ ] Partner -- [ ] Limited [ ] General | [ ] Partner -- [ ] Limited [ ] General |
| [ ] Attorney in Fact | [ ] Attorney in Fact |
| [ ] Trustee | [ ] Trustee |
| [ ] Guardian or Conservator | [ ] Guardian or Conservator |
| [ ] Other:_____ | [ ] Other:_____ |

RIGHT THUMBPRINT OF SIGNER
TOP OF THUMB HERE

Signer is Representing:_____      Signer is Representing:_____

AUS:0053676/00101:446551v14

THE STATE OF *Oregon* §
§
COUNTY OF *Wallowa* §

This instrument was acknowledged before me on the _25_ day of _July_, 2011, by _Mark Hemstreet_, _Member_ _____ of Shilo Inn, Killeen, LLC, an Oregon limited liability company, on behalf of said limited liability company.

_Tami J. Phinney_
Notary Public in and for the State of _Oregon_

```
OFFICIAL SEAL
TAMI J PHINNEY
NOTARY PUBLIC-OREGON
COMMISSION NO. 436591
MY COMMISSION EXPIRES APRIL 7, 2013
```

THE STATE OF _Oregon_ §
§
COUNTY OF _Wallowa_ §

    This instrument was acknowledged before me on the _23_ day of _July_ , 2011, by Mark S. Hemstreet, an individual.

_____
Notary Public in and for the State of _Oregon_

OFFICIAL SEAL
TAMI J PHINNEY
NOTARY PUBLIC-OREGON
COMMISSION NO. 436591
MY COMMISSION EXPIRES APRIL 7, 2013

## EXHIBIT A

Legal Description

Lot One (1), Block One (1), KILLEEN CIVIC AND CONFERENCE CENTER HOTEL ADDITION, an
addition to the City of Killeen, Bell County, Texas, according to the map or plat of record in Cabinet D,
Slide 99-A, Plat Records of Bell County, Texas

AUS:0053676/00101:446551v14

| 1 | In re SHILO INN, KILLEEN, LLC, | CHAPTER  11 |
|---|---|---|
| 2 | Debtor(s). | CASE NO 2:10-bk-62057-VZ |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA  90067

A true and correct copy of the foregoing document described as **NOTICE OF MOTION AND MOTION (1) PURSUANT TO BANKRUPTCY RULE 9019 TO APPROVE COMPROMISE OF CONTROVERY; AND (2) TO DISMISS BANKRUPTCY CASE; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF CHRISTOPHER CAMPBELL IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 2, 2011** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

* John-patrick M Fritz    jpf@lnbrb.com
* David B Golubchik    dbg@lnbrb.com, angela@lnbyb.com
* Andrew Haley    ahaley@gpfm.com
* Dare Law    dare.law@usdoj.gov
* Andrew S Pauly    apauly@gpfm.com
* Michael Reed · othercourts@mvbalaw.com
* Melanie C Scott    Melanie.Scott@usdoj.gov
* United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
* Brandon J Witkow · bwitkow@lockelord.com

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On  **August 2, 2011** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

**VIA U.S. MAIL**
ALL CREDITORS (see attached service list)

☒  Service information continued on attached page

(PROOF OF SERVICE CONTINUED ON FOLLOWING PAGE)

1

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 2, 2011** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

**VIA ATTORNEY MESSENGER**
Honorable Vincent P. Zurzolo
U.S. BANKRUPTCY COURT
255 E. Temple Street, Ctrm 1368
Los Angeles, CA  90012

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

| **August 2, 2011** | Angela Antonio | /s/ Angela Antonio |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                    **F9013-3.1**

2

In re Shilo Inn, Killeen, LLC
REQUESTS FOR SPECIAL NOTICE

**SERVED VIA FIRST CLASS U.S. MAIL**

Counsel to Cathay Bank
Alfred M. Clark, III
Brandon J. Witkow
Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Ste 2600
Los Angeles, CA 90071

Counsel to Cathay Bank
W. Steven Bryant
Locke Lord Bissell & Liddell LLP
600 Travis Street, Suite 2800
Houston, Texas 77702

U.S. Trustee *
Ernst & Young Plaza
725 S. Figueroa Street, 26th Floor
Los Angeles, CA 90017

Tai C. Tran
Locke Lord Bissell & Liddell
100 Congress Avenue, Suite 300
Austin, TX 78701-2748

Counsel to Cathay Bank
Gregory S. Lowry
Locke Lord Bissell & Liddell LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201

Cathay Bank
Gregory Badura
Cathay Bank
Special Asset Department
17432 Colima Road
Roland Heights, CA 91748

Michael Reed
McCREARY, VESELKA, BRAGG & ALLEN,
Attorneys for Claimant, Tax Appraisal
District of Bell County
P. O. Box 1269
Round Rock, Texas 78680

In re Shilo Inn, Killeen, LLC
Secured Creditors

**SERVED VIA FIRST CLASS U.S.
MAIL**

Cathay Bank c/o Al Clark, Esq.
Lorde Bissell et al.
300 S. Grand, Suite 2600
Los Angeles, CA 90071

Tax Appraisal District of Bell Cty
PO Box 390
Belton, TX 76513-0390

In re Shilo Inn, Killeen, LLC
20 Largest Creditors

SERVED VIA FIRST CLASS U.S. MAIL

Killeen Economic Development Corp.
PO BOX 548
Harker Heights, TX 76548

HOHMANN, TAUBE & SUMMERS LLP
A/R
100 CONGRESS AVE 18TH FLOOR
AUSTIN, TX 78701

WORLD CINEMA INC
A/R
9801 WESTHEIMER #409
HOUSTON, TX 77042-3653

PARADIGM TAX GROUP
A/R
3030 N CENTRAL AVE #1001
PHOENIX, AZ 85012

TXU ENERGY
A/R
P O BOX 650638
DALLAS, TX 75265-0638

GRAINGER INC
Butch Hosterler
P.O. BOX 419267
KANSAS CITY, MO 64141-6267

LIBERTY MUTUAL
MARK SWANTEK
PO BOX 4555
PORTLAND, OR 97208-4555

THE IRWIN-HODSON COMPANY
2838 SE 9TH AVENUE
Portland, OR 97202-2509

ATMOS ENERGY
A/R
P O BOX 790311
ST LOUIS, MO 63179-0311

SURFACE SCAPES
A/R
5513 TAYLORS VALLEY RD
TEMPLE, TX 76502

ERNEST PACKAGING SOL
Yvonne Gardiol
14134 NE AIRPORT WAY
PORTLAND, OR 97230

BALTIC LINEN COMPANY INC
A/R
1999 MARCUS AVENUE
LAKE SUCCESS, NY 11040-5485

RESORT SUPPLY INC
A/R
1625 SE ANKENY ST
PORTLAND, OR 97214

OFFICE DEPOT INC.
A/R
PO BOX 88040
CHICAGO, IL 60680

TASKAR KIBBEE & ASSOCIATES PC
4900 SW GRIFFITH DR, SUITE 269
Attn: Roberta Taskar
BEAVERTON, OR 97005-2977

PORTLAND LIGHTING INC
A/R
10120 SW NIMBUS C-6
PORTLAND, OR 97223

WASHINGTON AUTOMATED INC
A/R
5801 23RD DRIVE W  S
EVERETT, WA 98203

BOYD COFFEE COMPANY
Becky Erhler
19730 NE SANDY BLVD
PORTLAND, OR 972330

TRELLIS EARTH PRODUCTS
A/R
13315 NE AIRPORT WAY #800
PORTLAND, OR 97230

BALL JANIK, LLP
A/R
101 SW MAIN #1100
PORTLAND, OR 97204

In re Shilo Inn, Killeen, LLC
Master Mailin List

**SERVED VIA U.S. MAIL OR NEF (*)**

**VIA E-MAIL ONLY**
Shilo Inn, Killeen, LLC
11600 SW Shilo Lane
Portland, OR 97225-5995
E-mail: wes.raborn@shiloinns.com

David B. Golubchik *
Levene, Neale, Bender, Yoo & Brill LLP
10250 Constellation Blvd.
Suite 1700
Los Angeles, CA 90067

U.S. Trustee *
Ernst & Young Plaza
725 S. Figueroa Street, 26th Floor
Los Angeles, CA 90017

A-BETTER PLUMBING COMPANY
A/R
PO BOX 476
NOLANVILLE, TX 76559

ADELMAN TVL SYSTEMS INC
A/R
3303 N SHERIDAN RD - HANGER 19
TULSA, OK 74115

ATMOS ENERGY
A/R
P O BOX 790311
ST LOUIS, MO 63179-0311

BALL JANIK, LLP
A/R
101 SW MAIN #1100
PORTLAND, OR 97204

BALTIC LINEN COMPANY INC
A/R
1999 MARCUS AVENUE
LAKE SUCCESS, NY 11040-5485

BOB STEINER
Bob Steiner
11600 SW SHILO LANE
PORTLAND, OR 97225

BOYD COFFEE COMPANY
Becky Erhler
19730 NE SANDY BLVD
PORTLAND, CA 92730

BRIDGEWATER INTERNATIONAL
A/R
1948 WEST 2425 S SUITE#4
WOODSCROSS, UT 84087

CARLSON WAGONLIT TRAVEL
C/O US ARMY
BUILDING 504 A
EL PASO, TX 79906-1190

CARLSON WAGONLIT TRAVEL
A/R
52008 ARIZONA ST
FORT HUACHUCA, AZ 85613

CARLSON WAGONLIT TRAVEL
A/R  Ground Floor
BL11WGD 11 HAP ARNOLD BLV
TOBYHANNA, PA 18466

Cathay Bank c/o Al Clark, Esq.
Lorde Bissell et al.
300 S. Grand, Suite 2600
Los Angeles, CA 90071

CITY OF KILLEEN/UTILITY COLLECTIONS
A/R
PO BOX 549
KILLEEN, TX 76540-0549

COX'S WELDING
A/R
717 E ADAMS
TEMPLE, TX 76501

David L. Swanson, Esq.
Locke Lord Bissell & Liddell, LLP
2200 Ross Ave, Suite 2200
Dallas, TX 75201

ESP EMPLOYESS SERVICES
A/R
4 INDUSTRIAL WAY W
EATONTOWN, NJ 07724

FHS TRAVEL
CORP TRAVEL
11971 FOUNDATION PL
RANCHO CORDOVA, CA 95670

GRAINGER INC
Butch Hosterler
P.O. BOX 419267
KANSAS CITY, MO 64141-6267

HOHMANN, TAUBE & SUMMERS LLP
A/R
100 CONGRESS AVE 18TH FLOOR
AUSTIN, TX 78701

Internal Revenue Service
Insolvency I Stop 5022
300 N. Los Angeles St., #4062
Los Angeles, CA 90012-9903

Killeen Economic Development Corp.
PO BOX 548
Harker Heights, TX 76548

KIRBY RESTAURANT SUPPLY
A/R
809 S EASTMAN RD
LONGVIEW, TX 75602

LIBERTY MUTUAL
BILL ANDERSON
PO BOX 4555
PORTLAND, OR 97208-4555

LODGE NET
A/R
P O BOX 952141
SAINT LOUIS, MO 63195-2141

NEXION INC
A/R
1 E KIRWOOD BLVD
SOUTHLAKE, TX 76092

OAK FARMS DAIRY
Edith Kubala
PO BOX 202193
DALLAS, TX 75320

OFFICE DEPOT INC.
A/R
PO BOX 88040
CHICAGO, IL 60680

PARADIGM TAX GROUP
A/R
3030 N CENTRAL AVE #1001
PHOENIX, AZ 85012

PORTLAND LIGHTING INC
10120 SW NIMBUS C-6
Attn: A/R
Portland, OR 97223

RESORT SUPPLY INC
A/R
1625 SE ANKENY ST
PORTLAND, OR 97214

SHILO FRANCHISE INTERNATIONAL LLC
Kevin Toll
11600 SW SHILO LANE
PORTLAND, OR 97225

Shilo Franchise International. LLC
11600 SW Shilo Lane
Portland, OR 97225-5995

SHILO MANAGEMENT CORP
Kevin Toll
11600 SW SHILO LANE
PORTLAND, OR 97225

Shilo Management Corporation
11600 SW Shilo Lane
Portland, OR 97225-5995

SHILO RESTAURANT KILLEEN LLC
Kevin Toll
11600 SW SHILO LANE
PORTLAND, OR 97225

Shilo Restaurant, Killeen, LLC
3701 S WS Young Drive
Killeen, TX 76542

SURFACE SCAPES
A/R
5513 TAYLORS VALLEY RD
TEMPLE, TX 76502

SYSCO FOOD SERVICES OF AUSTIN
101 CHISHOLM TRAIL
Attn: A/R
Round Rock, TX 78681

TASKAR KIBBEE & ASSOCIATES PC
4900 SW GRIFFITH DR, SUITE 269
Attn: Roberta Taskar
BEAVERTON, OR 97005-2977

Tax Appraisal District of Bell Cty
PO Box 390
Belton, TX 76513-0390

TEXAS STATE COMPTROLLER
A/R
PO Box 149359
AUSTIN, TX 78714-9359

THE IRWIN-HODSON COMPANY
2838 SE 9TH AVENUE
Portland, OR 97202-2509

TRELLIS EARTH PRODUCTS
A/R
13315 NE AIRPORT WAY #800
PORTLAND, OR 97230

TXU ENERGY
A/R
P O BOX 650638
DALLAS, TX 75265-0638

UNITED STATES TREASURY
A/R
55 N ROBINSON STOP 5113-1627
OKLAHOMA CITY, OK 73132

WASHINGTON AUTOMATED INC
A/R
5801 23RD DRIVE W  S
EVERETT, WA 98203

WORLD CHOICE TRAVEL
A/R
11300 U.S. HIGHWAY ONE SUITE #300
NORTH PALM BEACH, FL 33408

WORLD CINEMA INC
A/R
9801 WESTHEIMER #409
HOUSTON, TX 77042-3653

Tax Appraisal District of Bell County
c/o Michael Reed
P.O. Box 1269
Round Rock, Texas 78680

Micros Systems, Inc.
Attn: Legal Dept.
7031 Columbia Gateway Dr.
Columbia Maryland 21046-2289

BALTIC LINEN COMPANY INC
A/R
1999 MARCUS AVENUE
LAKE SUCCESS, NY 11040-5485

W W Grainger Inc.
Attn: Special Collections Dept.
MES178823423587
7300 N Melvina
Niles IL 60714

ATMOS ENERGY CORPORATION
ATTN: BANKRUPTCY GROUP
PO BOX 650205
DALLAS TX 75265-0205

Lodge Net Interactive
3900 W. Innovation St. Isolde Kondert
Sioux Falls SD 57107

TXU Energy Retail Company LLC
CO Bankruptcy Department
PO Box 650393
Dallas TX 75265-0393

City of Killeen Texas
Traci S. Briggs
POB 1329
Killeen TX 76540

Qwest Communications Company, LLC
Attn: Bankruptcy
1801 California St Rm 900
Denver CO 80202

Carrier Corp.
Attn: Joyce Kuppel
Po Box 4808 Building TR-5
Syracuse NY 13221

Central Telephone Co. Of Texas
Po Box 165000
Altamonte Springs FL 32716

Liberty Mutual Insurance Co.
Customer Accounting Svs.
100 Liberty Way PO Box 1525
Dover New Hampshire 03820-1525

Killeen Economic Development Corp.
Phyllis Gogue V.P.
Po Box 548
Killeen TX 76540-0548

OFFICE DEPOT
6600 N. Military Trail-S401F
Boca Raton FL 33496